## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LESLIE R. VETTER | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: 8:16-cv-02833-PWG |
| | ) |
| AMERICAN AIRLINES, INC. | ) |
| PILOT LONG TERM DISABILITY PLAN | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is an action brought by a plan participant pursuant to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking payment of long-term disability benefits provided under an employer-sponsored disability plan, and other relief. Plaintiff is entitled to an award of long term disability benefits under the American Airlines, Inc. Pilot Long Term Disability Plan (hereafter "the Plan") pursuant to 29 U.S.C. § 1132(a)(1)(B) as a matter of law.

### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE ISSUE

Plaintiff, Leslie R. Vetter (hereafter "Leslie" or "Plaintiff") is a pilot for American Airlines, Inc. (hereafter "American Airlines"). Leslie was employed as a First Officer by American Airlines when she stopped working and filed a claim for disability benefits. (*See* Dkt. No. 1, ¶9 and Dkt. No. 7, ¶9). As a result of her employment, Leslie was eligible to participate in a number of employee benefit plans provided by American Airlines including a long-term disability plan. (*Id.*, ¶10 and Dkt. No. 7, ¶10).

1

Leslie's job with American Airlines included the following requirements:

• Requires good communication skills, adaptable personality, quick and accurate decision making and close attention to detail.

• Must fulfill FAA criminal background checks to qualify for unescorted access privileges to airport security identification display areas (SIDA).

• Must be able to secure appropriate airport authority and/or US Customs security badges.

Age:           At least 21.

Height:        Height requited to fully operate and actuate all controls and other equipment at each crewmember position of all aircraft operated by American Airlines.

Visual Acuity:     Corrected to 20/20.

Weight:        In proportion to height.

Education:     College degree or equivalent is preferred.

Citizenship:   U. S. citizen or appropriate documents; however, the applicant must be able to read, write, fluently speak and understand the English language. Valid passport required.

Certificates, ratings, and permits:

•   FAA Commercial License (with investment rating) or Air Transport Rating, multi-engine, with an Instrument rating, no limitations.
•   Flight Engineer Certificate or Flight Engineer Basic & Turbojet or FEX written examinations passed within the last 24 months.
•   Valid FCC Restricted Radio Telephone Operator permit.
•   Valid First Class Medical Certificate (explain restrictions).
•   Flight Time: Commensurate with other qualifications.

(*See* Administrative Record, p. 0622).[1]

The essential job functions of her position include the following:

- Stand, sit, stoop, crawl, walk and sometimes run.
- Understand basic concepts of math, physics, navigation, airplane systems and aeronautics.
- Discern and interpret cockpit instruments (Analo and Digital) and appropriate color coding.
- Reach and manipulate various controls such as control column, control wheels, rudder pedals, valves, push buttons, switches and keyboards.
- Perceptually determine the connect placement of switches, valves, handles, and any other controls,
- Ability to hear instructions and clearances In a cockpit environment.
- Ability to hear crew responses in a cockpit environment.
- Reach, push, or pull objects located in cramped quarters or accesses.
- Communicate orally within a cockpit environment to clearly convey procedures, conversation, and radio transmissions.
- Observe and understand cockpit audio communications with and without a headset or from a cockpit speaker.
- Capability of decision-making under stress.
- Memorization of various pieces of technical data and specified procedures.
- Conduct operations in a dimly lit cockpit environment for night operation.
- Ability to read publications and documents, often in a dimly lighted cockpit.
- Ability to see other airplanes.
- Ability to work in close quarters.
- Ability to work at heights.
- Ability to detect burning substances, kerosene, gasoline, and hydraulic odors as well as peculiar odors not normally found in the airplane cockpit through use of the senses.
- Ability to read computer screens and microfiche tiles.
- Ability to override jammed or manually operative flight controls in emergency situations.
- Lifting or moving of heavy objects such as life rafts or other emergency equipment.
- Ability to operate and reset emergency exit handles.
- Ability to open and close airplane doors and hatches.

---

[1] The Administrative Record was jointly submitted by the parties with the court today. (Dkt. Nos. 21 and 22). References to the Administrative Record and applicable pages are hereafter denoted as "AR p. ___".

- Ability to evacuate the airplane in an emergency from available exits.
- Ability to understand and accomplish dynamic tasks.
- Methodical, analytical and systematic thought processes.
- Ability to work cooperatively with crewmembers, peers, supervisors and passengers of diverse nature who may hold divergent views.
- Provide instructions in a clear, concise and grammatically correct form.
- Carry a kitbag, weighing approximately forty pounds and suitcase while climbing a widebody jetbridge stairway, stow kitbag in belly on certain aircraft types.
- Climb or descend steep or narrow passageways.
- The ability to adapt to diversified flight schedules, situations, or scenarios.
- Persuasiveness In constructively encouraging peak performance and in providing optimal solutions required in normal and emergency operations.
- Ability to open window and evacuate cockpit via a rope in an emergency.
- Ability to complete training in ditching and emergency procedures.
- Report to work on a regular and timely basis.

(*See* AR, p. 0623).

In June 2011, Leslie started experiencing declining health. She started waking up almost every night and experienced loss of sleep and fatigue. She had never had sleep problems before in her life. She once slept through a hurricane in Miami. The sleep problems increased and Leslie began waking up every one or two hours during the night. She tried many over-the-counter sleep aids and herbal remedies with no success. She changed lifestyle habits such as refraining from caffeine late in the day, foregoing watching television as she got ready for bed, and making sure her bedroom was pitch black. Even those nights she would have a drink before bed, Leslie still had problems sleeping. None of these efforts improved her sleep problems or other symptoms. She also had flu-like symptoms such as vomiting and nausea without having the flu or sinus issues. She also had headaches more often than before and felt "lousy," for lack of a better term. She had

trouble concentrating, felt she was in a brain fog, and often found it difficult to remember common names or maintain a steady train of thought. In December 2011, Leslie returned from flying a trip and experienced unexplained, severe stomach pains which became a recurring experience. All these symptoms continued to worsen. (*Id.*, p. 0164).

The problems progressed and Leslie soon began suffering from depression and exhaustion. She no longer enjoyed her life as much she once did and had little desire to do anything during the day. By the end of January 2012, Leslie did not feel well enough to continue flying. Her health declined to the point she could no longer function on a daily basis without assistance for many of life's routine tasks. Leslie certainly was not physically or mentally capable of piloting a commercial aircraft. (*Id.*). Prior to that time, she began missing more work and eventually used up her entire sick bank. She went out on approved unpaid sick leave in February 2012. (*Id.*, p. 0165).

In the summer of 2012, Leslie's condition continued to worsen and she also started suffering symptoms similar to Bells Palsy. For example, her Aviation Medical Examiner ("AME"), David Kessler, M.D., noticed during an August 2012 visit that the left side of her face was droopy. To some extent, her face is still droopy. These symptoms are also consistent with Lyme disease. Leslie was seen by James L. Schaller, M.D., a board-certified neurologist. Dr. Schaller is a nationally-known Lyme disease expert. Dr. Schaller reviewed Leslie's history, conducted a thorough examination, reviewed laboratory results and conducted new diagnostic studies. He diagnosed her with Lyme disease as well as Babesiosis and atypical Bartonella. Lynette H. Posorske, M.D., an infectious disease specialist, also diagnosed her with Lyme disease. (AR 0165).

In February 2012, after using her accumulated sick leave, Leslie submitted a claim for long-term disability benefits. Her claim was denied on July 31, 2012. (*Id.*, ¶12 and Dkt. No. 7, ¶12;

AR 0158-162). She subsequently filed an administrative appeal of the denial of her long-term disability claim. *Id*., ¶12 and Dkt. No. 7, ¶12; AR 0120-670).

In support of her administrative appeal, Leslie, through her counsel, provided medical records from numerous treating and examining physicians, including records from James L. Schaller, M.D. (AR pp. 0179-185; 0244-264); Lynette H. Posorske, M.D. (AR pp. 0602-609); David B. Kessler, M.D. (AR p. 0611); Paula A. Corrigan, M.D. (AR p. 0614); Brian C. Turrisi, M.D. (AR pp. 0511-519); William R. Stern, M.D. (AR pp. 0553-600); Marina Johnson, M.D. (AR pp. 0429-510) and other physicians who treated her for her multiple symptoms and medical conditions.

A brief summary of the medical evidence submitted in support of Leslie's administrative appeal include the following:

James L. Schaller, M.D.: Dr. Schaller is a neurologist with extensive experience in the diagnosis and treatment of patients with Lyme disease. (AR 0244-264). He has provided medical care and treatment to Leslie. Dr. Schaller provided an initial primary diagnosis of Headaches and Fatigue and secondary diagnoses of Atypical Bartonellosis, Atypical Babesiosis, Joint Pain and Weight Dysregulation. (AR 0179). In an Initial Physician's Statement dated September 25, 2012, the history he took included headache and severe fatigue, joint pain, weight increase, and fragmented sleep. (AR 0180). He placed restrictions on Leslie's return to her employment, stating she "cannot perform duties of flight officer (Captain) until symptoms resolved. Very compliant w[ith] treatment." (*Id*.). In an earlier report dated August 20, 2012, Dr. Schaller noted in a Disability Summary Findings that Leslie suffered from severe and profound fatigue, daily headaches, sleep disturbances, weight dysregulation and migrating joint pain." (AR 0245). His

prognosis was for a 100% recovery, however, at that time, Dr. Schaller was of the opinion she could not safely perform her duties as a pilot of a large commercial aircraft.  (AR 0248).

Lynette H. Posorske, M.D.:    Dr. Posorske is an Internist who is board certified in Infectious Disease Medicine.  Leslie was referred to Dr. Posorske by Dr. Kessler.  (AR 0602).  Dr. Posorske noted a "quite complex" history, noting "she began to experience the symptoms that are more probably to her now, including extreme difficulty in sleeping, fatigue, a feeling of profound depression …, and a persistent 5 pound weight gain, despite severe caloric restriction and intense exercise."  (*Id*.).  Dr. Posorske decided to have her undergo additional Lyme disease testing, developing a treatment plan "[s]ince Lyme disease Western blot alone are not adequate to rule in or rule out Lyme disease", she decided to repeat this testing as well as total and IgM antibody and C6 peptide.  (AR 0604).  The Lyme C6 peptide test, which is specific for Lyme disease, showed Leslie's levels to be "markedly elevated at 6.83".  (AR 0606, 609).[2]

David B. Kessler, M.D.:    Dr. Kessler is board-certified in Internal Medicine with a specialization in Nephrology.  Dr. Kessler is a Federal Aviation Administration Designated Senior Aviation Medical Examiner ("AME") who is also the AME for Leslie and thus familiar with her medical history.  (AR 0166).  On August 22, 2012, Dr. Kessler expressed his opinion regarding Leslie's ability to work as follows:  "[s]he is currently symptomatic and is unable to function as a flight officer until therapy has been completed and she has recovered."  (AR 0611).

_____

[2]  The C6 enzyme-linked immunosorbent assay (ELISA), based on a peptide (C6) that reproduces the sequence of invariable region 6 of VlsE, the antigenic variation protein of *Borrelia burgdorferi*, has been shown to be a sensitive and specific test for the serologic diagnosis of Lyme disease.   *Evaluation of the C6 Peptide Enzyme-Linked Immunosorbent Assay for Individuals Vaccinated with the Recombinant OspA Vaccine*,  Clin Microbiol. 2002 Jul; 40(7): 2591–2593.

<u>Paula A. Corrigan, M.D.:</u>          Dr. Corrigan is an aerospace medicine physician practicing in Texas.  She is board certified in Aerospace Medicine and Public Health & General Preventive Medicine.  Dr. Corrigan conducted a review of Leslie's medical records and provided the following opinion:

> Ms. Vetter has requested the assistance of our office as Aeromedical Advisors in reporting medical information on her behalf to the FAA.  We have requested all pertinent medical records regarding her medical history.  Based upon review of her medical records, we can confirm that Ms. Vetter is currently prohibited from exercising the privileges of her Airman's Medical Certificate under the provisions of Section 61.53 of the FAR.  She has appropriately grounded herself while undergoing further evaluation and treatment for her condition.  Her condition will require review and clearance from the FAA before she can return to flying duties.

<u>(AR 0614).</u>

<u>Brian C. Turrisi, M.D.:</u>          Dr. Turrisi is board certified in Internal Medicine and Pulmonary Disease.  Leslie was referred to Dr. Turrisi for a pulmonary workup after giving up smoking and not feeling well.  (AR 0512).  Dr. Turrisi noted complaints of fatigue and after having examined her, provided multiple diagnoses as follows:  (1) Fatigue, probably multiple etiologies. (2) Mild hypothyroidism.  (3) Mild perimenopausal state.  (4) Mild obstructive lung disease.  (5) History of chest pain secondary to the after effects of rib fractures.  (AR 0514).

<u>William R. Stern, M.D.:</u>          Dr. Stern is board certified in Internal Medicine and Gastroenterology.  Leslie treated with Dr. Stern for her digestive issues.  (AR 0554-600).  She was referred by Dr. Turrisi.  (AR 0558).  Among Dr. Stern's impressions were "multi-system disorder", fatigue and sleep disorder.  (AR 0559-560).

<u>Marina Johnson, M.D.:</u>          Dr. Johnson is board certified in Internal Medicine and Endocrinology.  Leslie started seeing Dr. Johnson in March 2012 based upon a referral from a registered nurse at American Airline Medical.  (AR 0165).  Her records contain multiple references

to fatigue and/or exhaustion.  (AR 0461,464, 476, 484).  Dr. Johnson subsequently opined on June 6, 2012, that Leslie was unable to return to work due to epigastric and abdominal pain.  (AR 0516).

In June 2013, American Airlines requested MES Solutions (hereafter "MES") to perform a review of the Leslie's medical records.  (AR 0089-93).  American Airlines requested that MES limit its consultation to specified medical conditions and specific questions.  (AR 0091).  More specifically, American Airlines directed MES to conduct its medical records review as follows:

> **It should also be noted that this request for professional medical consultation is to determine disability and treatment compliance only, as referenced in the Plan.  This request for medical consultation should not address the Pilot's fitness for duty, qualification or disqualification for FAA medical certificate for the Pilot, Pilot loss of license, or factors other than those contained in the questions stated below, as the Plan's determining factors for approval of disability and/or whether or not the Pilot meets the requirement of receiving and complying with qualified medical care (treatment compliance).**

(AR 0091, emphasis in original).

MES issued an undated "Peer Review Report" regarding the its review of this appeal.  The medical records for the appeal were reviewed by four physicians:  Jad A. Khoury, M.D. (Internal Medicine/Infectious Disease), Ronald J. Orleans, M.D. (Obstetrics and Gynecology), Ronald S. Sims, M.D. (Neurology/Sleep Medicine) and Steven C. Tawil, M.D. (Internal Medicine/Gastroenterology).  (AR 0094-111).  Each of these four physicians spoke by telephone with James W. Butler, M.D. (Preventive/Occupational Medicine/Aerospace Medicine).  (AR 0096, 100, 103 and 107).[3]  The "Peer Review Report does not indicate that Dr. Butler was in possession of or reviewed any of Leslie's medical records.  (AR 0094-111).  There is no reference in the Peer Review Report that any of these physicians ever treated or examined Leslie, ever saw Leslie, or ever spoke with one of her treating or examining physicians.  (*Id*.).

---

[3] Dr. Sims did not speak with Dr. Butler but rather spoke with his office. (AR 0103).

The Plan contains a number of provisions relevant to the present claim. They include the following:

### III.    DEFINITIONS

For purposes of this Plan, the following definitions shall apply, unless the context clearly indicates otherwise. These defined terms are capitalized throughout this document to indicate their special meaning within the context of the Plan:

A. **"Active Pilot Employee"** means a Pilot Employee who performs or is eligible to perform duties as a pilot for the Company. An Active Pilot Employee will include a Pilot Employee who is receiving Compensation from an Employer or the Association for periods during an Authorized Leave of Absence. (AR 0133).

N. **"Disability"** or **"Disabled"** means an illness or injury, verified through a qualified medical authority in accordance with Section V of the Plan, which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer, other than:

(1) Fear of flying syndrome, unless there is a preeminent psychiatric diagnosis; or

(2) Chemical dependency showing no progress toward recovery after two (2) years; Or

(3) Any illness or injury which was intentionally self-inflicted or an attempted suicide; or

(4) Any illness or injury which was contracted, suffered or incurred while the Pilot Employee was engaged in a criminal activity; or

(5) Any illness or injury which was the result of war or any act of war, whether war is declared or not; or

(6) Any illness or injury which arose during the period of an unpaid leave of absence (other than an Association Leave) or Furlough while such Pilot Employee was absent from employment with the Employer; provided, however, that if a Pilot Employee had a Disability prior to beginning a Furlough and the Pilot Employee would have been recalled absent an illness or injury that would be considered a Disability, the Pilot Employee is deemed to have a Disability (if the illness or injury would otherwise qualify as such) from the date that the Pilot Employee would have been recalled. (AR 0135-136).

10

Y.  **"Pilot Employee"** means an Employee on the Pilot System Seniority List of the Company for such period or periods that he is on such list.  Pilot Employee will include an individual permitted to participate in the Plan as provided under the Agreements.  (AR 0137).

## IV.  ELIGIBILITY AND TERMINATION OF PLAN PARTICIPATION

### A.  Eligibility for Plan Coverage

Active Pilot Employees on the U.S. payroll of an Employer shall become eligible for coverage as of February 1, 2004. Pilot Employees hired on or after February 1, 2004 become eligible for coverage on their first day of Service. Pilot Employees who are not Active Pilot Employees on February 1, 2004 (who are, for example, (1) receiving Disability benefits under the Program, (2) on an Authorized Leave of Absence, (3) on Furlough, and (4) other similar situations) will automatically become eligible for coverage on their first day of Service upon their return to active duty with the Employer.

### B.   Termination of Coverage

Plan Coverage ends on the earlier of the following events:

- Termination of employment, except that Disability benefits will continue beyond termination of employment in accordance with Section V of this Plan;
- Commencement of a "Retirement Benefit" under the Program;
- Normal Retirement Date;
- Becoming ineligible for the coverage due to a change in job classification; or
- Death.

(AR 0137-138).


## **IX.** FIDUCIARIES' DUTIES

### A. Fiduciaries
The "Fiduciaries" (herein so called) of the Plan shall be the following:

11

(1) The Company;
(2) The Employers;
(3) The Administrator;
(4) The Pension Benefits Administration Committee;
(5) Such other person or persons that are designated to carry out fiduciary responsibilities under the Plan.

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan. A fiduciary may employ one or more persons to render advice with regard to any responsibility such fiduciary has under the Plan. Each fiduciary shall discharge the his duties and responsibilities with respect to this Plan in accordance with the provisions more particularly set forth in this Plan.

B. Allocation of Responsibilities
The powers and responsibilities of the fiduciaries are hereb allocated as indicated below:

(1) Company. The Company shall be responsible for all functions assigned or reserved to it under the Plan. Any authority assigned or reserved to the Company under the Plan shall be exercised by resolution of the members of the Board of Directors.

(2) Employer. The Employer shall be responsible for all functions assigned or reserved to it under the Plan. Any authority assigned or reserved to the Employer under the Plan shall be exercised by resolution of the Employer's board of directors.

(3) Administrator. The Administrator shall have the responsibility and authority to control the operation and administration of the Plan in accordance with the terms
of the Plan, except with respect to duties and responsibilities specifically allocated to other fiduciaries.
(4) Pension Benefits Administration Committee. The Pension Benefits Administration Committee shall have the responsibility and authority to control the operation and administration of the Plan in accordance with the terms of the Plan, except with respect to duties and responsibilities specifically allocated to other fiduciaries.

(5) Allocation of Responsibilities. Powers and responsibilities may be allocated to other fiduciaries as provided for under this Section.

This Section is intended to allocate to each fiduciary the individual responsibility for the prudent execution of the functions assigned

to it, and none of such responsibilities or any other responsibility shall be shared by two (2) or more of such fiduciaries unless such sharing shall be provided for by a specified provision of the Plan.

C. Procedures for Delegation and Allocation of Responsibilities
Fiduciary responsibilities may be allocated as follows:

(1) The Administrator may specifically allocate responsibilities to specified individuals.

(2) The Company may designate one or more individuals or committees of individuals to carry out any of its fiduciary responsibilities in connection with the Plan. Any such designation may be made in the Plan, by the Board of Directors or by an officer or officers duly authorized by the Board of Directors to make such designation on behalf of the Company. Any designation, or revocation thereof made by the Board of Directors or by such officer or officers shall be made in writing, shall specify the responsibilities which the designee is to carry out and shall be filed with the Secretary of the Company, from whom the name and committee assignment, if any, of all individuals so designated and of any officers authorized to make such designations shall be available.

(a) The Pension Benefits Administration Committee may designate a person or persons other than a fiduciary to carry out fiduciary responsibilities under the Plan, provided that the authority granted the Pension Benefits Administration Committee under this subparagraph shall not cause any person or persons employed to perform ministerial acts and services for the Plan to be deemed fiduciaries of the Plan.

Any allocation of responsibilities pursuant to this Section shall be made by filing a written notice thereof with the Administrator and the Company specifically designating the person or persons to whom such responsibilities or duties are allocated and specifically setting out the particular duties and responsibilities with respect to which the allocation or designation is made.

D. General Fiduciary Standards
A fiduciary shall discharge his duties with respect to the Plan solely in the interest of the Pilot Employees and:

(1) For the exclusive purpose of providing benefits to Pilot Employees and defraying reasonable expenses of administering the Plan;

(2) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and

(3) In accordance with the documents and instruments governing the Plan, insofar as such documents and instruments are consistent with the provisions of Title I of ERISA.

(AR 0149-151).

## ARGUMENT

## I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT.

Plaintiff is entitled to summary judgment on her claim for wrongful denial of benefits because Plaintiff is entitled to benefits under the Plan as a matter of law. There is no basis for Defendant's wrongful denial of Plaintiff's claim for long-term disability benefits. Further, the medical evidence relating to Plaintiff's disability strongly supports her entitlement to benefits. To reach a different conclusion requires the fiduciary to disregard unrebutted evidence of record and its fiduciary duties imposed by ERISA and the Plan. Defendant has wrongfully failed to award disability benefits in conformity with the terms of its Plan and has acted arbitrarily and capriciously in contravention of its fiduciary duties under ERISA.

The purpose of summary judgment is to isolate, and then terminate, claims and defenses that are factually unsupported. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The Supreme Court has emphasized that summary judgment is to be viewed not as a disfavored technical shortcut, but rather as an integral component of the Federal Rules. *Id*. at 327. Summary judgment motions must be resolved not only with appropriate regard for the rights of those asserting claims and defenses to have their positions ruled upon by a fact finder, but also with due regard for the rights of persons

opposing such claims and defenses to demonstrate, under this Rule and before the trial, that the claims and defenses have no factual basis. *Id*.

Summary judgment is proper when, after an adequate period for discovery, one party is unable to show a genuine issue as to a material fact on which that party will bear the burden of proof at trial, so long as judgment against that party is appropriate as a matter of law *Id*. at 322. A "genuine issue" exists where the evidence before the court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In *Felty v. Graves-Humphry Co.*, 818 F.2d 1126 (4th Cir. 1987), the Fourth Circuit discussed the Supreme Court's holdings in *Anderson v. Liberty Lobby*, *supra*, and *Celotex Corp. v. Catrett*, *supra*. The *Felty* court emphasized that trial judges have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to the trial." *Id*. at 1128. Applying these principles to the facts of record in the present case, it is clear that Plaintiff's Motion for Summary Judgment is both appropriate and warranted. The record in this case is devoid of any factual or legal support for Defendant's wrongful denial of benefits. Defendant's administrative review was unreasonable and not supported by substantial evidence of record. Absent ignoring substantial medical evidence, Defendant cannot proffer substantial evidence that would indicate that Plaintiff was not totally disabled during the period in question. Further, review of the Defendant's handling of this claim unequivocally shows that Defendant has acted in an unreasonable, arbitrary and capricious manner in violation of its fiduciary duties under ERISA and the Plan. Accordingly, summary judgment in favor of the Plaintiff should be granted.

## II.    <u>STANDARD OF REVIEW</u>

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held as follows:

> [W]e hold that a denial of benefits challenged under § 1132(a)(1)(B)
> is to be reviewed under a *de novo* standard unless the benefit plan gives
> the administrator or fiduciary discretionary authority to determine
> eligibility for benefits or to construe the terms of the plan.

109 S.Ct. at 956-957. The Plan grants Defendant such discretionary authority; Sections VII(D)(4)

and VIII(G)(1) of the Plan provide the Administrator with discretionary authority.

When, as here, an ERISA benefit plan vests the plan administrator with discretionary

authority to make eligibility determinations, the court reviews the administrator's decision

for abuse of discretion. *Williams* v. *Metro. Life Ins. Co., 609* F.3d 622, 629-3 0 (4th Cir. 2010).

The review is "limited to the body of evidence before the administrator at the time it rejected [the]

claim." *Donnell* v. *Metro. Life Ins. Co.,* 165 Fed. Appx. 288, 294 (4th Cir.2006). The plaintiff has

the burden of proving an abuse of discretion.

Under the abuse of discretion standard, the Court "must not disturb the (administrator's)

decision if it is reasonable, even if the court itself would have reached a different conclusion."

*Fortier v. Principal Life Ins. Co. ,* 666 F.3d 231, 235 (4th Cir. 2012). "The administrator's decision

is reasonable if it is the result of a deliberate, principled reasoning process and it is supported by

substantial evidence." *DuPerry v. Life Ins. Co. of* N. *Am.,* 632 F.3d 860, 869 (4th Cir. 2011)

(internal quotation marks omitted). Substantial evidence is that "which a reasoning mind would

accept as sufficient to support a particular conclusion." *Id.* It "consists of more than a mere scintilla

of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec.*

*Corp*., 747 F.2d 197, 208 (4th Cir. 1984). [I]f there is evidence to justify a refusal to direct a verdict

were the case before the jury, then there is substantial evidence." *Bickel v. Sunbelt Rentals, Inc.*,

No. WMN o9—2735, 2010 WL 3938348 (D. Md. Oct. 6, 2010) (internal quotation marks

omitted)(quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

The administrator's decision must be based on the whole record and the administrator cannot pick and choose evidence that supports its decision while ignoring other relevant evidence in the record." *Mills* v. *Union Sec. Ins. Co.,* 2011 WL 2036698, at 11 (E.D.N. C. May 24, 2011) *(citing Myers v. Hercules, Inc.,* 253 F.3d 761. 768 (4th Cir. 2001).

The Fourth Circuit has identified eight nonexclusive factors that the Court may consider in reviewing the reasonableness of an administrator's decision:  (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5 ) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have . *DuPerry*, 632 F.3d at 869 (internal citation and quotation marks omitted).

### III.    PLAINTIFF IS ENTITLED TO THE ENTRY OF SUMMARY JUDGMENT IN HER FAVOR.

#### A.  Defendant Failed To Evaluate The Disabling Effect All Of Plaintiff's Medical Conditions Taken Together.

Defendant limited MES' medical records review and its resulting opinions.  (AR 0089-93). Defendant instructed MES to evaluate certain medical conditions and then answer specific questions Defendant posed regarding whether disability arose from such independent medical condition.  Defendant's actions in directing MES on what medical conditions to consider and whether disability was tied to that specific condition is a violation of ERISA and the fiduciary obligations imposed by ERISA.

It is well established under ERISA that presented with a disability claim by a claimant who suffers from multiple ailments, a plan administrator may not simply evaluate each condition independently to determine whether any single condition is sufficiently disabling. Rather, ERISA requires the administrator to evaluate the possibly disabling effect of all medical conditions taken together. *Turner v. Retirement and Benefit Plans Committee, Robert Bosch Corporation,* 585 F.Supp. 2d 696 (D.S.C. 2007); *Layton v. Heckler*, 726 F. 2d. 440, 442 (8th Cir. 1984); *Torgeson v. UNUM Life Insurance Company of America*, 466 F. Supp. 2d., 1096, 1134 (N.D. IA 2006); *Nickola v. Group Life Assurance Co.*, 2005 U.S. Dist. LEXIS 16219, 2005 WL1910905 (N.D. Ill. 2005); *Austin V. Continental Casualty Co.*, 216 F. Supp. 2d 550, 558 (W.D.N.C. 2002); *Buffaloe v. Reliance Standard Life Insurance Co.*, 2000 U.S. Dist. LEXIS 22201, 2000 WL33951195 (E.D.N.C. 2000). This is precisely what did **not** occur in reviewing Plaintiff's appeal. Rather than consider the combination of Plaintiff's multiple medical conditions and how they affected her ability to pilot a commercial aircraft, Defendant limited the inquiry to whether the disability was caused by a specific medical condition or diagnosis. (AR 0091-93). For each of the medical conditions Defendant directed MES to review, it then required MES to answer a question it posed: "Does the evidence reflect disability (as defined by the Plan), arising from this diagnosis?" (*Id.*). This question was designed to limit the scope of the MES review and it achieved its goal. This is evidenced by the instruction Defendant gave to MES upon its referral for review:

> **It should also be noted that this request for professional medical consultation is to determine disability and treatment compliance only, as referenced in the Plan. This request for medical consultation should not address the Pilot's fitness for duty, qualification or disqualification for FAA medical certificate for the Pilot, Pilot loss of license, or factors other than those contained in the questions stated below, as the Plan's determining factors for approval of disability and/or whether or not the Pilot meets the requirement of receiving and complying with qualified medical care (treatment compliance).**

(AR 0091, emphasis in original).

Defendant's purposeful limitation of the MES review effectively removed any independence that this medical records examiner had in undertaking its "peer review". Defendant's conduct violated ERISA and warrants the entry of summary judgment in favor of Plaintiff.

> B. Defendant Disregarded Substantial Evidence Supporting Plaintiff's Disability And Failed To Consider The Whole Record.

Beyond limiting the scope of the medical review and thereby limiting the nature and extent of Plaintiff's medical conditions and their resulting disabling effects, Defendant disregarded substantial evidence supporting Plaintiff's disability by failing to consider the record as a whole. While plan administrators "are not required to accord any special deference to the opinions of treating physicians over those of non-treating consultants" *Hensley v. Int'l Bus. Machs. Corp*., 123 Fed. Appx. 534, 539 (4th Cir. 2004); and "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; courts may not impose upon plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, when a plan administrator denies benefits in the face of conflicting medical opinions, the conflicting evidence on which the administrator relies must be substantial. *Stup v. Unum Life Ins. Co*., 390 F.3d 301, 308 (4th Cir. 2004); *Elliott v. Sara Lee Corp*., 190 F.3d 601, 606 (4th Cir. 1999). The decision "must be based on the whole record and [the plan administrator] cannot pick and choose evidence that supports its decision while ignoring other relevant evidence" before it. *Mills v. Union Sec. Ins. Co*., 2011 WL 2036698, at *11 (E.D.N.C. May 24, 2011) (*citing Myers v. Hercules, Inc*., 253 F.3d 761, 768 (4th Cir. 2001)).

19

That is precisely what occurred in the present case. Defendant limited the scope and responses of the medical reviewer, preventing MES from fully and fairly conducting its "peer review" and its independence and impartiality was restricted because its client (Defendant) instructed it to curb its inquiry. The result was MES was constrained to answer Defendant's specially-posed questions and therefore did not allow MES to conduct a meaningful review of all of Plaintiff's medical conditions and determine whether the combination of these conditions resulted in her disability.

Although Defendant was aware of the diagnoses of Drs. Schaller and Posorske that Plaintiff had Lyme disease (AR 0179-185, 244-264, 601-609), Defendant did not include Lyme disease as a medical condition that MES should review in the six specific areas it directed it to address. (AR 0091-93). Further, Defendant was aware, as indicated by medical evidence of Dr. Posorske of August 2012 that persistent insomnia and fatigue existed **after** Dr. Turrisi's July 23, 2012 note, and even was aware of medical evidence that in August 2012, Plaintiff's Lyme C6 peptide testing was remarkably elevated and by March 2013 further Lyme disease testing showed an abnormal Western blot and persistence of the elevated Lyme C6 peptide, while Plaintiff was also having episodic facial/head pains. (AR 0104). Yet, despite this plethora of medical evidence that Plaintiff's insomnia and fatigue had persisted for at least eight months **after** Dr. Turrisi's July 2012 note, Defendant ignored this substantial evidence of overwhelming fatigue based upon the single report of a pulmonologist who only saw the Plaintiff on a few occasions between March and July 2012.

Defendant's disregard of the above substantial evidence is especially egregious since its medical reviewer, Dr. Ronald Sims, specifically advised Defendant that "[t]he claimant's occupation as a flight officer absolutely requires intact concentration and freedom from

somnolence during waking hours. Her medical record abundantly documents that she was not able to function as a flight officer because she did have somnolence, impaired concentration, and fatigue associated with poor nocturnal sleep" (AR 0105), and "other medical evidence indicates persistence of insomnia and fatigue (Dr. Posorske, August 2012)" (*Id.*), while also noting "[s]ince insomnia can be caused by a multitude of medical conditions, a large part of managing insomnia involved addressing such problems. . . . If Lyme disease involved the central nervous system is a cause of insomnia, the prognosis is favorable with effective treatment of that condition." (AR 0106). Dr. Sims also advised in his report that "[t]hese conditions (persistent fatigue, wake time somnolence, and insomnia) disabled Plaintiff from her employment." (AR 0105). Since Dr. Sims noted that Plaintiff had an abnormal Western blot and a continuance of the elevated Lyme C6 peptide in March 2013(AR 0104), clearly the cause for Plaintiff's persistent insomnia can be reasonably concluded to be her Lyme disease, which Defendant's medical reviewer, Dr. Sims, noted to be a cause of insomnia and Plaintiff's resulting disability. Certainly, in light of the above statements and opinions of Dr. Sims, it was unreasonable for Defendant to conclude Plaintiff's insomnia did not persist beyond the July 23, 2012 date of Dr. Turrisi's office note. Thus, the Defendant's conclusion that Plaintiff's fatigue and insomnia had resolved by July 23, 2012, and she was not entitled to benefits after that date, disregarded substantial contrary evidence supporting Plaintiff's disability.

III.    Defendant Breached Its Fiduciary Duties Owed To Plaintiff.

American Airlines, who is vested with the decision-making authority to grant or deny claims, is an ERISA fiduciary based on that fact. *Libby Owens Ford Company v. Blue Cross and Blue Shield Mutual of Ohio,* 982 F.2d 1031, cert. denied, 114 S.Ct. 72 (6th Cir. 1993). *See also, Vogel v. Independence Federal Savings Bank*, 728 F. Supp. 1210 (D.C. Md 1990), Simmons v.

21

Willcox, 911 F. 2d 1077 (5th Cir. 1990); *Drinkwater v. Metro Life Insurance Co*., 846 F. 2d 821,

(1st Cir.), cert. denied, 488 U.S. 909 (1988); *PIA Michigan City, Inc. v. National Porges Radiator Corp.*, 789 F. Supp. 1421 (N.D. Ill 1992); and *Toland v. McCarthy*, 499 F. Supp. 1183 (D.C. Mass. 1980).

The fiduciary responsibility provisions of ERISA provide as follows:

…a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)    for the exclusive purpose of:

     (i)    providing benefits to participants and their beneficiaries; and
     (ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
…

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.29 U.S.C.§ 1104.

An ERISA fiduciary duty is applicable as much to the handling of claims as to any other aspect of a fiduciary's conduct.  *Russell v. Mutual Life Insurance Co.,* 722 F. 2d 482 (9th Cir. 1983) *reversed on other grounds,* 105 S. Ct. 3085, 473 U.S. 134; *Ogden V. Michigan Bell Telephone Co*., 599 F. Supp. 961 (D. Mich. 1984).  In fact, ERISA provides that a plan must provide for a meaningful claims review including the right to a full and fair review:

In accordance with regulations of the Secretary, every employee benefit plan shall-

(1)    provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2)    afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C.§ 1133.

The failure of an employee benefit plan to provide adequate reasons for termination of a claim, or to afford a participant the right to a full and fair review, constitutes a violation of ERISA. *Weaver v. Phoenix Home Life Insurance Co.,* 990 F.2d 154 (4th Cir. 1993); *White v. Jacobs Engineering Group Long-term Disability Benefit Plan*, 986 F.2d 344 (9th Cir. 1989); *Short v. Central States, Southeast and Southwest Areas Pension Fund,* 729 F.2d 567 (8th Cir. 1984); *Wolfe v. JCPenney Co., Inc.* 710 F.2d 388 (7th Cir. 1983); *Brown v. Retirement Committee of Briggs and Straton Retirement Plan,* 577 F.Supp. 1073 (D.Wis. 1983); *Halpern v. W.W. Grainger, Inc.,* 962 F. 2d 685 (7th Cir. 1992).   Assertions setting forth mere conclusions do not suffice to establish the basis for denial of a claim. (*Id.*).

It is within this legal framework that American Airlines' denial of Plaintiff's claim for benefits must be viewed.   What is critical in this matter is that ERISA is designed to be administered in a manner not requiring constant involvement with the courts.  As the Fourth Circuit has observed:

> Congress intended that ERISA provide plan administrators and participants the opportunity and freedom to resolve internal disputes without necessarily having to resort to the expense and delay of the courts.  See *Berry v. Ciba-Geigy Corp.*, 761 F. 2d 1003, 1007 n. 4 (4th Cir. 1985); *Grossmuller v. International Union, United Auto, Aerospace and Agric. Implement Workers of Am.*, 715 F. 2d 853, 857 (3d Cir. 1983).

> Given this goal, Congress assured plan participants of procedural fairness, by mandating that plan administrators provide a "full and fair review" of claims and the specific reasons for claim denials.  In the words of the Third Circuit, "**full and fair review must be construed** not only to allow a pension plan's trustees to operate claims procedures without the formality or limitations of adversarial proceedings, **but also protect a plan participant from arbitrary or unprincipled decision-making**."  *Grossmuller,* 715 F.2d at 857 (emphasis added).

23

*Weaver v. Phoenix Home Life Mutual Insurance Co.,* 990 F. 2d 154 (4th Cir. 1993). In addition, federal regulations in effect at the time Plaintiff filed her claim for disability benefits mandate that "every employee benefit plan shall establish and maintain reasonable claims procedures" and impose "certain minimum requirements" for claims § procedures to be considered reasonable. 29 C. F. R. §2560.503-1.

These minimum requirements include the establishment of a procedure to review the denial or termination of a claim for benefits:

> Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. 29 C. F. R. §2560.503-1 (g)(1).

The fiduciary responsibility provisions of ERISA impose both a duty of loyalty and a duty of care. See, e.g. 29 U.S.C. Section 1106 (duty of loyalty); 29 U.S.C. Section 1104 (duty of care). If American Airlines intentionally violated the minimum requirements for reasonable claims procedures in order to frustrate Plaintiff's exercise of her rights under the benefit plan or in order to promote American Airlines' own financial interests to the detriment of the beneficiary, then American Airlines has breached the duty of loyalty it owed to Plaintiff. If American Airlines' wrongful denial of Plaintiff's claim for benefits or its failure to provide a prompt, full and fair review of this termination resulted from lack of care, skill, or diligence, then American Airlines has breached the duty of care it owed to Plaintiff. In either case, American Airlines' actions constitute a violation of federal law and a breach of the fiduciary duty American Airlines owed Plaintiff.

American Airlines breached its fiduciary duty owed to Plaintiff by denying her right to a full and fair review. Defendant attempted to limit the scope of the medical review and tried to

direct substance of the written opinions its medical reviewers provided by requiring them to respond only to the tailored questions it posed in its referral to MES.  (AR 0090-93).  American Airlines specifically instructed its medical reviewers to "not address the Pilot's fitness for duty, qualification or disqualification for FAA medical certificate for the Pilot, Pilot loss of license, or factors other than those contained in the questions below."  (AR 0091).  Certainly, a fair and impartial administrator would not impose such limitations upon the independence and impartiality of its medical reviewers if they intended to comply with their ERISA-imposed fiduciary duties of loyalty and care.  Further, they would not undertake such actions as to limit the scope of the medical review and to restrict the opinions elicited if they wished to comply with the fiduciary standards of discharging its duties solely in the interest of the Pilot Employees and for the exclusive purpose of providing benefits to Pilot Employees as explicitly provided for by the Plan.  (AR 0151).

## CONCLUSION

Based upon the foregoing, summary judgment should be entered in favor of the Plaintiff.

Respectfully submitted,


_____/s/_____
Charles F. Fuller, Esq.
Federal Bar # 05557
McCheseny & Dale, P.C.
4710 Bethesda Ave., Suite 205
Bethesda, MD  20814
Tel:    301.657.1500
Fax:    301.657.1506
Email: Chuck@dalelaw.com

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2017, a copy of the foregoing was served by electronic

filing via CM/ECF to the registered participants as identified on the Notice of Electronic Filing:

S. Libby Henninger, Esquire
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, N.W., Suite 400
Washington, DC  20006

Daniel W. Srsic
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215


_____/s/_____
Charles F. Fuller