## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **LESLIE R. VETTER** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO.: 8:16-cv-02833-PWG** |
| | ) |
| **AMERICAN AIRLINES, INC.** | ) |
| **PILOT LONG TERM DISABILITY PLAN** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff, Leslie R. Vetter (hereafter "Leslie" or "Plaintiff") suffers from Lyme disease. Leslie's medical condition was not diagnosed until more than a year after she first became ill. Defendant does not deny Plaintiff suffers from Lyme disease and affirmatively found that she "tested positive for exposure to [Lyme disease], she treated with oral antibiotic therapy, and that the infection persisted in March 2013". (Dkt. No. 26, p.13).

As noted in the Administrative Claim, "with respect to her [Leslie's] most recent disability, she worked until January 5, 2012. She used whatever vacation and sick pay she had accumulated until February 21, 2012, and then submitted her claim for PLTD." (AR 0060; Dkt. No. 26, p. 2).[1] Defendant determined Leslie was indeed disabled under the Plan. (AR 0057). It determined that Leslie's disability was the result of insomnia, which was no longer disabling after July 23, 2012.

---

[1] Defendant notes Leslie returned to work (Dkt. No. 26, p.3, n.1) but does not indicate the date of her return to work. Leslie previously advised the Court she returned to work on October 1, 2013. (Dkt. No. 1, ¶¶ 24, 27-28; Dkt. No. 13).

(AR 0057, 0069). In order to assess Defendant's abuse of discretion during its administration of Leslie's administrative appeal, it is important to understand Leslie's diagnosed medical condition, symptoms and job duties. A brief summary is provided for reference in the instant Opposition brief.

### Lyme disease

According to the Centers for Disease Control and Prevention ("CDC"), Lyme disease is caused by the bacterium *Borrelia burgdorferi* and is transmitted to humans by the bite of infected blacklegged ticks. Typical early Lyme symptoms include fever, headache, fatigue, and a characteristic skin rash called erythema migrans. If left untreated, infection can spread to joints, the heart, and the nervous system. Lyme disease is diagnosed based on symptoms, physical findings (*e.g.*, rash), and the possibility of exposure to infected ticks; laboratory testing is helpful in the later stages of disease. The CDC notes that patients who fail to receive early antibiotic treatment often experience severe joint pain and swelling and may develop chronic neurological problems, including shooting pains, numbness or tingling in the hands or feet, and problems with short-term memory. Even after antibiotic treatment, 10-20% of patients with Lyme disease experience symptoms that can last for years, including muscle and joint pains, cognitive defects, sleep disturbance, and fatigue; this condition is referred to as post-treatment Lyme disease syndrome. The ticks that transmit Lyme disease can occasionally transmit other tick-borne diseases as well. *See* Exhibit 1, Centers for Disease Control and Prevention, *Lyme Disease*, *available at* http://www.cdc.gov/ncidod/dvbid/lyme.

Lyme disease can result in multi-systemic problems, including persistent headache, gastrointestinal manifestations, and vision problems. Increased intracranial pressure in patients with Lyme disease is a reported finding and can result in headache, nausea, and vomiting. *See*

Exhibit 2, James Moses, M.D., *et al.*, *Lyme Disease Presenting With Persistent Headache*, Pediatrics, Vol. 112, No. 6, Dec. 2003.  Neurological manifestations of Lyme disease, including persistent headache, are most common in the later stages of Lyme disease.  *Id.*  Gastrointestinal manifestations of Lyme disease are common and can result in nausea, vomiting, abdominal pain, and diarrhea, *etc.*   *See* Exhibit 3, Syed Ali Zaidi, *et al.*, *Gastrointestinal and Hepatic Manifestations of Tickborne Diseases in the United States,* Clinical Infectious Diseases, 2002.

The central difficulties in the diagnosis and treatment of Lyme disease stem from the lack of sufficiently sensitive and reliable biological markers of the disease.  Without such markers, it is difficult to determine who has the disease, the effectiveness of a course of treatment, and the end point of treatment.  The ideal antibiotics, route of administration, and duration of treatment for persistent Lyme disease are not established.  No single antibiotic or combination of antibiotics appears to be capable of completely eradicating the infection, and treatment failures or relapses are reported with all current regimens, although they are less common with early aggressive treatment. *See* Exhibit 4, Lorraine Johnson, JD, MBA, Executive Director, CALDA, *Lyme Disease: Two Standards of Care*, *available at* http://www.harp.org/Twostandardsofcare.htm.

### Symptoms

Leslie reported her symptoms in her Declaration supplied in support of her administrative appeal (AR 0164-66) and to her treating physicians throughout her course of treatment.  Among the symptoms she reported are the following:

- Loss of sleep, fatigue, flu-like symptoms, vomiting and nausea, headaches, trouble concentrating, difficulty remembering common names or maintaining train of thought, severe stomach pains, depression, exhaustion, left side of face drooping, sweats.  (Declaration of Leslie R. Vetter, AR 0164-66).

- Severe and profound fatigue, daily headaches, sleep disturbances, weight dysregulation and migrating joint pain. (Report of James L. Schaller, M.D., AR 0245).

- Extreme difficulty sleeping, fatigue, feeling of profound depression, persistent 5 pound weight gain, bloating. (Report of Lynette H. Posorske, M.D., AR 0602-05).

- Sleep problems, night sweats, nausea, vomiting, fatigue, weight gain, stomach pain, bloating, chronic constipation. (Report of William R. Stern, M.D., AR 0558-60).

### Job Description and Essential Functions

Leslie's job requirements and essential job function were set forth in her original motion for summary judgment. (Dkt. No. 23-1, pp. 2-4). The job requirements of her position were not included and are provided here as follows:

### Job Description

- Reports for duty before assigned flight. Access computer terminals for sign-in and acquisition of flight plans, weather information and other associated documents. Analyzes in concert with Flight Dispatch, the plan of intended routing and fuel loading taking into account weather and other conditions.

- Conducts detailed examination of exterior and interior of aircraft, operating and testing various systems and components. Reviews any discrepancies and determine whether aircraft is acceptable for flight operation.

- Completes pre-flight checklists (manually & visually), contacts FAA by radio to acquire clearances and brief flight attendants.

- Supervises push-back activities and taxi aircraft to runway. Communicates with appropriates FAA facilities and complete additional system tests and checklists as required.

- During flight, performs checklist, visually monitors aircraft systems, communicates with FAA facilities, navigates and monitors air traffic. Simultaneously, monitor enroute weather, and alter routing as necessary while continually analyzing fuel consumption. In the event of abnormal or

emergency situations, take immediate required action and determine if immediate landing is necessary.

- Plans and executes approach and landings, often at night and in inclement weather. In the event of inclement weather, uses instrument flight rules to land or divert to an alternate airport and plan fuel usage accordingly.

- Taxis aircraft to gate, shut down engines and prepare or the next flight segment.

- Must be able to work varying hours of the day or night, on weekdays, and holidays. Frequently on duty for as long as twelve to fourteen hours and will span many time zones and extreme weather differences in the course of a trip. Frequently be away from home for three, or more days and nights staying in out-of-town hotels.

(AR-0621). Relevant job requirements include:

**Certificates, ratings, and permits:**
- FAA Commercial License (with instrument rating) or Air Transport Rating, multi-engine, with an instrument rating, no limitations.
- Flight Engineer Certificate or Flight Engineer Basic & Turbojet or FEX written examinations passed within the last 24 months.
- Valid FCC Restricted Radio Telephone Operator permit.
- Valid First Class Medical Certificate (explain restrictions).

(AR-0622). Finally, a relevant job function includes reporting to work on a regular and timely basis. (AR-0624).

## DEFENDANT ABUSED ITS DISCRETION IN ADMINISTERING THE ADMINISTRATION APPEAL.

The parties appear to be in agreement regarding the standard of review that applies in this case. Plaintiff refers to the applicable standard of review under ERISA as the "abuse of discretion standard" (Dkt. No. 23-1, pp. 15-17) while Defendant refers to it as the "abuse of discretion standard". (Dkt. No. 26, pp. 11–12). For all intents and purposes, they are the same. *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

In reviewing a claim under the abuse of discretion standard, the Court analyzes the eight factors identified by the United States Court of Appeals for the Fourth Circuit in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan,* 201 F.3d 335 (4th Cir. 2000). *See also DuPerry v. Life Ins. Co. of N. Am.,* 632 F.3d 860, 869 (4th Cir. 2011). The Fourth Circuit identified eight nonexclusive factors that the Court may consider in reviewing an ERISA benefit claim to determine the reasonableness of an administrator's decision: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth*, 201 F.3d at 342-43; *DuPerry*, 632 F.3d at 869 (internal citation and quotation marks omitted). Although Defendant contends in its Motion for Summary Judgment that its decision was the result of a deliberate, principled reasoning process and supported by substantial evidence, application of the *Booth* factors clearly establishes that Defendant abused its discretion in denying Plaintiff's claim for long term disability benefits. Since neither party fully addressed these factors in their respective motions for summary judgment, Plaintiff takes the opportunity to address them in her Opposition.

(1) **The Language of the Plan**.

The Plan provides in order to be eligible for disability benefits, a pilot must have an injury or illness, verified by a qualified medical authority, which prevents the pilot from acting as an

Active Pilot Employee for American Airlines.[2]  In order to be an Active Pilot Employee, a pilot

must perform or be eligible to perform the duties of a pilot for American Airlines.[3]  American

Airlines requires its pilots to have a "Valid First Class Medical Certificate" in order to qualify for

the position.  (AR 0622).  Thus, the Plan requires investigation or inquiry whether a pilot claiming

disability is qualified or disqualified for a FAA medical certificate since the pilot must have this

certificate in order to perform or be eligible to perform the duties of a pilot.  Without the certificate,

the pilot American's Job Description and also is prohibited by federal law from flying commercial

aircraft without such a certificate.[4]

---

[2] The Plan defines **"Disability"** or **"Disabled"** to mean "an illness or injury, verified through a qualified medical authority in accordance with Section V of the Plan, which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer . . ." (AR 0135).

[3] The Plan defines **"Active Pilot Employee"** to mean "a Pilot Employee who performs or is eligible to perform duties as a pilot for the Company. An Active Pilot Employee will include a Pilot Employee who is receiving Compensation from an Employer or the Association for periods during an Authorized Leave of Absence."  (AR 0133).

[4] Federal Aviation Regulations ("FAR") provide:

**§61.53   Prohibition on operations during medical deficiency.**

(a) *Operations that require a medical certificate.* Except as provided for in paragraph (b) of this section, no person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person:

(1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation; . . .

14 C.F.R. §61.53.

Leslie knew or had reason to know that she had a medical condition that made her unable to meet the requirements of the medical certificate. (AR 0167). She had been ill since June 2011 and her deteriorating health caused her to stop flying airplanes in January 2012. (AR 0164). Two physicians, David B. Kessler, M.D.[5] and Paula A. Corrigan, M.D., both Aviation Medical Examiners (AME), advised her that she was prohibited from flying, which is a requirement to be a pilot for American Airlines. More specifically, after she had been diagnosed with Lyme disease nearly a year before the decision to deny Leslie's appeal, Dr. Kessler, stated "[s]he is currently symptomatic and is unable to function as a flight officer until therapy has been completed and she has recovered." (AR 0611). Less than a month after Dr. Kessler expressed his opinion, Dr. Corrigan, after reviewing Leslie's medical records, stated "we can confirm that Ms. Vetter is currently prohibited from exercising the privileges of her Airman's Medical Certificate under the provisions of Section 61.53 of the FAR. She has appropriately grounded herself while undergoing further evaluation and treatment for her condition. Her condition will require review and clearance from the FAA before she can return to flying duties." (AR 0614). Thus, two qualified medical authorities expressed their expert opinions that Leslie could not function as a pilot because she did not qualify to meet the requirements of her medical certificate and thus would not be eligible to perform the duties of a Pilot due to her illness. (AR 0611, 0614).

In the course of administering Plaintiff's administrative appeal, Defendant instructed its medical record reviewers **not** to undertake certain actions while carrying out their duties as "independent" medical records reviewers in contravention of the Plan language. More specifically, in its letter to MES Solutions requesting a peer review evaluation of Leslie's medical records and other documents, American Airlines instructed MES as follows:

---

[5] Dr. Kessler was Leslie's AME (AR 0165) and therefore familiar with her medical condition.

> **It should also be noted that this request for professional medical consultation is to determine disability and treatment compliance only, as referenced in the Plan. This request for medical consultation should not address the Pilot's fitness for duty, qualification or disqualification for FAA medical certificate for the Pilot, Pilot loss of license, or factors other than those contained in the questions stated below, as the Plan's determining factors for approval of disability and/or whether or not the Pilot meets the requirement of receiving and complying with qualified medical care (treatment compliance).**

(AR 0091, emphasis in original). This direction not only acted to remove MES' "independence" from its role as an impartial peer reviewer, it is also interfered with MES' ability to determine whether Leslie's medical conditions prevented her from qualifying for a FAA First Class Medical Certificate. Defendant's conduct thus impeded the determination whether Leslie's medical conditions prevented her from being eligible to fly commercial aircraft, which would have led to the determination that she was "disabled".

Defendant's conduct was contrary to the eligibility provisions of the Plan and acted as a deterrent to an award of benefits. This factor weighs heavily against American Airlines in its claim that its decision was the result of a deliberate, principled reasoning process.

(2) **The Purposes and Goals of the Plan.**

The stated purpose of the Plan is to provide "[i]ncome protection during periods of Disability [that]is a fundamentally important concern for each of us." (AR 0133). The Plan goes on to advise that

> Long term Disability benefits for eligible pilots have previously been provided under the Disability provisions of the American Airlines, Inc. Pilot Retirement Benefit Program ("the Program"). This Plan replaces the Disability benefits provided under the Program for Disabilities incurred after the Plan's Effective Date and is provided, administered and funded by the Company subject to the Agreements between the Association and the Company. . . ." (AR 0133).

Since the purpose of the Plan is to protect the income of eligible pilots during periods of disability, Defendant's interference with the proper assessment by MES of Leslie's medical

condition acted to frustrate the stated purpose of the Plan by defeating her appeal. Defendant's mishandling of this appeal, by its failure to consider Leslie's disability as a combination of all her medical conditions and symptoms, rather than evaluating each condition separately (Dkt. No. 23-1, p. 18), as the MES report unquestionably demonstrates, further frustrated the stated purpose of the Plan. Further, Defendant's selective review of Leslie's medical records, disregarding substantially all of the evidence supporting her disability (Dkt. No. 23-1, pp. 19 – 21), contravened the purpose of the Plan and furthered only the interests of American Airlines at the expense of Leslie. All of these abuses establish Defendant's failure to meet its fiduciary duty of reaching a benefit determination as a result of a deliberate, principled reasoning process.

### (3) The Adequacy of the Materials Considered to Make the Decision and the Degree to Which They Support It.

There was substantial medical evidence supplied by Leslie in support of her appeal. In fact, although her medical condition was difficult to diagnose and she was caused to seek treatment from multiple medical specialists in an attempt to identify her illness, the opinions of her treating physicians regarding her ability to work as a pilot were nearly unanimous among those physicians who expressed their opinion.

The medical records submitted to Defendant identify multiple medical conditions and many more symptoms that arose from these conditions. Medical records were submitted from Doctors Schaller, Stern, Posorske, Kessler, Corrigan, Turrisi, Johnson, Thomas and Richards. These records covered multiple medical diagnoses including Babesiosis, Bartonella and Systemic Inflammation (AR 179-85, 245-47); possible Lyme disease, small intestinal bacterial growth, fatigue, headaches, possible sleep disorder, constipation (AR 0555-600); Lyme disease (AR 0602-09); mild hypothyroidism, mild perimenopausal state, mild obstructive lung disease, history of chest pain, bacterial overgrowth syndrome, perimenopause with hormonal changes, insomnia

improving, generalized fatigue and history of vocal cord polyps (AR 0512-32).  Drs. Kessler and Corrigan provided reports expressing their opinions that Leslie was unable to function as a pilot and failed to qualify for her medical certification.  (AR 0611-14).

Beyond the multiple diagnoses contained in her medical records, those records, along with her Declaration, identify numerous complaints of symptoms including severe and profound fatigue, daily headaches, sleep disturbances, weight dysregulation and migrating joint pain, extreme difficulty sleeping, fatigue, feeling of profound depression, persistent 5 pound weight gain, bloating, sleep problems, night sweats, nausea, vomiting, fatigue, weight gain, stomach pain, bloating, chronic constipation,  loss of sleep, fatigue, flu-like symptoms, vomiting and nausea, headaches, trouble concentrating, difficulty remembering common names or maintaining train of thought, severe stomach pains, depression, exhaustion, left side of face drooping, sweats. (*See* p. 4, *supra*).

Clearly, there was an abundance of medical evidence for the Defendant to properly find Leslie to be disabled under the Plan.  This of course did not happen due to the Defendant's failure to engage in a deliberate, principled reasoning process.  This factor weighs against the Defendant as well.

> (4) **Whether the Fiduciary's Interpretation was Consistent with Other Provisions in the Plan and with Earlier Interpretations of the Plan.**

Defendant's interpretation of the Plan, as demonstrated by its instruction to MES to **not** consider fitness for duty, qualification or disqualification for FAA medical certificate or factors other than those contained in the questions it provided to MES, is inconsistent with the Plan provisions.  (*See* pp. 7-9, *supra*).

In addition, neither Defendant nor MES considered whether Leslie could perform her work duties as a pilot in reaching its disability decision.  (AR 0057-86, 90*93, 94-112).  As noted previously, "Disability" is defined by the Plan as

> "an illness or injury, verified through a qualified medical authority in accordance with Section V of the Plan, which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer, . . ."

(AR 0135).    Defendant's interpretation of "Disability", as evidenced by its actions, was inconsistent with the Plan definition since Defendant failed to properly consider Leslie's ability to perform her duties as a pilot in light of her medical diagnoses.

A number of courts have held that an administrator's proper consideration of a claimant's ability to perform his or her job requirements in light of the diagnosis is a significant factor to evaluate on arbitrary and capricious review.  *See, e.g., Elliott v. Metro Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) (determining that plan administrator's decision could not be considered "reasoned" when there was no discussion of claimant's duties or her ability to complete them in light of diagnoses); *Kalish v. Liberty Mutual/Liberty Life Assurance Company of Boston*, 419 F.3d 501, 507 (6th Cir. 2005) (finding that administrator's conclusion that claimant "might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day"); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296-97 (W.D. Pa. 2008).

In fact, in another long term disability action brought against American Airlines, their medical reviewer was found to have acted similarly to MES in the present case.  Both medical reviewers arrived at a decision that the claimant was not disabled without considering whether the claimant could actually perform their duties as a pilot in light of the diagnosis.  *Miller v. American*

*Airlines, Inc.,* 632 F.3d 837 (3d Cir. 2010).  The above Plan interpretation by the Defendant again demonstrates its inconsistent and erroneous interpretations of the Plan.[6]  Given the finding in *Miller* that American Airlines failed to properly consider the claimant's ability to perform his duties as a pilot when arriving at a decision that the claimant was not disabled, with very similar conduct on the Defendant's part in the present case, clearly this factor weighs heavily against American Airlines in the present matter.

> (5) **Whether the Decision-Making Process was Reasoned and Principled and**

> (6) **Whether the Decision was Consistent with the Procedural and Substantive Requirements of ERISA**.

Defendant's arguments posed in its motion for summary judgment (Dkt. No. 26-1, pp. 12-14) are superficially appealing.  They argue that they complied with the requirements of ERISA and the Plan and as a result their decision was reasonable.  It is only when one looks beyond the unsupported platitudes and peels back the layers underneath that it becomes readily apparent that the decision-making process was neither reasoned nor principled.

Defendant's decision-making process was in fact severely flawed in this case.  As demonstrated *supra*, Defendant improperly interpreted Plan provisions.  Defendant failed to properly consider whether Leslie could perform her duties as a pilot when determining she wasn't disabled.  Further, as shown *infra,* Defendant had a structural conflict of interest which clearly affected its judgment.  These deficiencies lead to the inescapable conclusion that Defendant's decision is not consistent with the procedural and substantive requirements of ERISA.  All of these

---

[6] The *Miller* plan is similar, although somewhat different, than the Plan language in the present case.  In *Miller*, the similar plan language provided "[d]isability means an illness or injury verified through a qualified medical authority . . . which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer."  *Id*. at 839.  The definition in *Miller* is nearly identical to the definition of "Disability" here.  *Supra*.

factors weigh heavily against the Defendant and warrant the reversal of its decision to deny Leslie disability benefits.

(7) **Any External Standard Relevant to the Exercise of Discretion.**

An issue that goes hand-in-hand with the requirement that an administrator must properly consider a claimant's ability to perform his or her job duties in light of their diagnoses is the issue of safety. Leslie is a commercial airline pilot. Her profession requires her, in its most simplistic form, to fly passengers, numbering in the dozens or perhaps the hundreds, each flight and to deliver them safely to their destination. With the profusion of symptoms that she has regularly experienced since the onset of her health issues in June 2011, placing her in the cockpit of an airplane responsible for the personal safety of its passengers is a troubling situation.

Under federal law, a pilot who knows or has reason to know of any medical condition that would make the pilot unable to meet the requirements for a medical certificate is prohibited from acting as a pilot, whether in command or in any other capacity. 14 C.F.R. §61.53(a)(1). Federal law further provides that each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmember, cargo and airplane. 14 C.F.R. §121.533.

One of Leslie's most troublesome symptoms is severe fatigue. The FAA has addressed fatigue in aviation, stating:

> Fatigue is an expected and ubiquitous aspect of life. For the average individual, fatigue presents a minor inconvenience, resolved with a nap or by stopping whatever activity that brought it on. Typically, there are no significant consequences. However, if that person is involved in safety-related activities such as operating a motor vehicle, piloting an aircraft, performing surgery, or running a nuclear reactor, the consequences of fatigue can be disastrous.

> 1. Fatigue can develop from a variety of sources. The important factor is not what causes the fatigue but rather the negative impact fatigue has on a person's ability to perform tasks. A long day of mental stimulation such as studying for an examination or processing data for a report can be as fatiguing as manual labor.

They may feel different—a sore body instead of a headache and bleary eyes—but the end effect is the same, an inability to function normally.

2. Fatigue leads to a decrease in your ability to carry out tasks. Several studies have demonstrated significant impairment in a person's ability to carry out tasks that require manual dexterity, concentration, and higher-order intellectual processing. Fatigue may happen acutely, which is to say in a relatively short time (hours) after some significant physical or mental activity. Or, it may occur gradually over several days or weeks. Typically, this situation occurs with someone who does not get sufficient sleep over a prolonged period of time (as with sleep apnea, jet lag, or shift work) or someone who is involved in ongoing physical or mental activity with insufficient rest.

Stressors. General aviation pilots are typically not exposed to the same occupational stresses as commercial pilots (i.e., long duty days, circadian disruptions from night flying or time zone changes, or scheduling changes). Nevertheless, they will still develop fatigue from a variety of other causes. Given the single-pilot operation and relatively higher workload, they would be just as much at risk (possibly even more) to be involved in an accident than a commercial crew. Any fatigued person will exhibit the same problems: sleepiness, difficulty concentrating, apathy, feeling of isolation, annoyance, increased reaction time to stimulus, slowing of higher-level mental functioning, decreased vigilance, memory problems, task fixation, and increased errors while performing tasks.

None of these are good things to have happen to a pilot, much less if there is no one else in the aircraft to help out.

In a variety of studies, fatigued individuals consistently underreported how tired they really were, as measured by physiologic parameters. A tired individual truly does not realize the extent of actual impairment. No degree of experience, motivation, medication, coffee, or will power can overcome fatigue.

Exhibit 5, *Fatigue In Aviation*, Federal Aviation Administration, https://www.faa.gov/pilots/safety/pilotsafetybrochures/media/Fatigue_Aviation.pdf; *see also* http://www.kswgcap.com/wp-content/uploads/April-2010-Safety-Briefing.pdf.

Failure to properly consider whether a pilot can perform his or her job duties in light of their medical diagnoses may cause the pilot to violate federal law and cause harm to himself or others, including crew members and passengers. This potentially dangerous result should impose a greater duty upon Defendant to strictly adhere to ERISA's requirements.

(8) **The Fiduciary's Motives and Any Conflict of Interest it May Have.**

Defendant has acted under a conflict of interest throughout the administration of Leslie's claim and appeal.  In a situation where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Firestone v. Bruch*, 489 U.S. 101, 115 (1989). In *Glenn v. Metropolitan Life Ins. Co*., 554 U.S. 105 (2008), the Supreme Court held that a conflict emerges "where it is the employer that both funds the plan and evaluates the claims" because "[i]n such a circumstance, "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket."" 554 U.S. at 112 (*internal citation omitted*).  Since *Glenn*, courts have found that entities serving as administrator who also fund the Plan suffer from a conflict of interest.[7]  *Helton v. AT&T Inc.,* 709 F.3d 343 (4th Cir. 2013) which held that AT&T operated under a conflict of interest because it served as administrator at the same time it was responsible for funding the plan.  The Fourth Circuit found that the conflict of interest may have motivated the Benefits Committee, composed of five AT&T executives, to omit from the record unfavorable evidence in AT&T's possession.  *Id.*

Likewise, in *Miller v. American Airlines*, *supra*, the Third Circuit noted that *Glenn* instructs that a conflict arises where an employer both funds and evaluates claims, even when the employer pays fixed contributions to a plan, evaluates claims, and pays claims through a trust.  *Glenn*, 554 U.S. at 112.  The scheme in *Miller* is similar to the funding/administration method in the present case.

---

[7] American Airlines is the Administrator and "named fiduciary" of the Plan.  (AR 0133, 142).
The Pension Benefits Administration Committee (PBAC) is appointed by the Board of Directors and is responsible to exercise the responsibilities of the Administrator.  (AR 0142).

Defendant cannot shield itself by claiming it was the decision of MES that found Leslie not to be disabled because the Defendant denied her claim before MES became involved in this matter.  Even after MES became involved, Defendant had incentive to deny Leslie's claim and thereby reduce its payments to the Plan or benefit by reducing benefit payments, leading to lower liabilities of the Plan and thus lower contribution payments on the part of Defendant.  Therefore, Defendant's structural conflict of interest weighs in Leslie's favor.

Based upon the foregoing, the *Booth* factors weigh heavily in favor of Plaintiff, resulting in the conclusion that Defendant abused its discretion in denying Plaintiff's claim for long term disability benefits.

**Miscellaneous Arguments of Defendant.**

Defendant raised several arguments that Plaintiff addresses briefly in this section.

1.      Defendant wrongly claims that Dr. James W. Butler "reviewed all of Plaintiff's medical records to evaluate whether Plaintiff was disabled by chronic insomnia and fatigue. Defendant also seeks to create a larger involvement on the part of Dr. Butler than the Peer Review Report and appeal denial letter establish.  (Dkt. No. 26, pp. 9, 10, 13, 15, 16, 17, and 18).  It appears Defendant used Dr. Butler as a show horse, trying to suggest more participation in the peer review than what actually occurred and trying to add weight to the questionable validity of the report by having it appear that a Senior Aviation Medical Examiner was intimately involved in its creation, despite the lack of any substantive involvement contained in the report itself.

In fact, both the Defendant's August 12, 2013 letter denying Plaintiff's appeal (AR 0057-0069) and the undated Peer Review Report of MES (AR 0070-0086, 0094 - 0112) contain no information or evidence that Dr. Butler reviewed any of Plaintiff's medical records.  These records reflect that the only involvement of Dr. Butler in the peer review was to sign the "Conflict of

Interest Attestation" under the section of each of the four medical reviewers (AR 0076, 78, 82 and

111). Nothing contained in the report indicates Dr. Butler either reviewed any medical records or

authored any part. Further, the administrative record reflects only that Dr. Butler spoke with three

of the four medical reviewers by phone (AR 0072, 76, 83). Despite the contentions of Defendant

at p. 16 of its Opposition Brief, the Peer Review Report indicates that Dr. Butler never spoke with

Dr. Ronald Sims, the Board Certified Neurologist and Sleep Medicine physician, who addressed

the Plaintiff's Lyme disease. Dr. Sims notes in his report that

> "Dr. James Butler MES Senior AME (Phone #) – contact was achieved with a
> member of his office staff, who took a message including my name, phone number
> and purpose of my call. Dr. Butler's office returned the call and we discussed my
> opinions, as reflected in this review and came to a reasonable consensus.

(AR 0078). Thus, the unrebutted evidence of record demonstrates that Dr. Butler's involvement in

the peer review was limited to brief telephone discussions with the records reviewer and signing

the conflict of interest attestation with each reviewer.

2.      Defendant argues that Plaintiff did not allege a cause of action for breach of

fiduciary duty and therefore must fail. Defendant is correct the Complaint does not contain a cause

of action for breach of fiduciary duty under 29 U.S.C. §1132(a)(3). This action is for the recovery

of the wrongful denial of benefits pursuant to pursuant to 29 U.S.C. §1132(a)(1)(B). The

Complaint does allege a breach of fiduciary duty, however, not as a cause of action but as a basis

for the wrongful denial of benefits. (Dkt. No. 1, ¶¶30-34). These breaches of fiduciary duty are

intended merely as evidence that Defendant improperly denied Plaintiff the benefits to which she

was entitled under the Plan. This correlates with the various *Booth* factors which are primarily

related to breaches of fiduciary duties.

3.      Defendant urges the Court to adopt the holding in *Meadows v. American Airlines,*

*Inc*., 2011 WL 1102774, *12 (S.D. Fla. March 24, 2011). *Meadows* is distinguishable from the

present case.  The definition of disability in Meadows is materially different than here.  In the present case, disability is defined a "an illness or injury . . . which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer" (AR 013).  An Active Pilot Employee is defined as "a Pilot **who performs or is eligible to perform** duties as a pilot for the Company."  A job requirement of a Pilot pursuant to the American Airlines Job Description is to have various certificates, ratings, and permits, including but not limited to a Valid First Class Medical Certificate.  Two AMEs, Dr. Kessler and Dr. Corrigan, have advised that Leslie did not qualify for her medical certificate due to her medical condition.  As a result, Leslie is "not eligible to perform duties as a pilot for the Company" due to her illness.  Thus, the material differences between the definitions of disability in *Meadows* and the present case require different outcomes.

There are additional distinctions such as the abundance of episodes of abuses of discretion committed by Defendant in this case.  *See* pp. 7-17, *supra*.  Further, the conflict of interest standard in the Fourth Circuit is much different than the Eleventh Circuit, and Defendant's numerous instances of conduct constituting abuse of discretion, are substantially different than in *Meadows*.

4.  Defendant tries to diminish the weight of the report of Dr. Corrigan, an AME, who opined that Leslie was prohibited from using her Airman's Medical Certificate due to her medical condition and treatment.  Further, Dr. Corrigan advised that Leslie would not be able to return to her flying duties until she received clearance from the FAA.  Dr. Corrigan clearly states in her report that she requested and reviewed all relevant medical record of Leslie before expressing an opinion.  That is unlike Dr. Butler, who Defendant is relying heavily upon in this litigation but who apparently play a very small role in the peer review.  The administrative record is clear that he did not review the medical records or author any reports.  He merely spoke by telephone with

three of the four medical records reviewers and signed four conflict of interest statements. Thus, Dr. Corrigan's report and opinions should be given great weight while Dr. Butler's opinions, if he expressed any at all, should be accord little or no weight.

5.    Defendant seeks to refute Plaintiff's argument that it is well established under ERISA that presented with a disability claim by a claimant who suffers from multiple ailments, a plan administrator may not simply evaluate each condition independently to determine whether any single condition is sufficiently disabling. Rather, ERISA requires the administrator to evaluate the possibly disabling effect of all medical conditions taken together. (*See* Plaintiff's Motion for Summary Judgment, Dkt. No. 23-1, pp. 18-19). Defendant's argument fails because the Peer Review Report shows without question that each of Plaintiff's conditions were considered individually and that Defendant did not consider the possibly disabling effect of all conditions and symptoms combined.

Defendant argues unpersuasively that "[p]laintiff's alleged concern makes little sense because the only argument Plaintiff makes is that she was disabled by Lyme disease, and more specifically by related insomnia and fatigue." (Dkt. No. 23, p.17). Defendant's argument supports the finding that it failed to consider the possibly disabling effect of all of her conditions taken together. Defendant makes no attempt to demonstrate that it considered the plethora of symptoms Plaintiff experienced due to what was eventually diagnosed as Lyme disease and was presented for review on appeal. Defendant suggests that its consideration of Lyme disease, along with related insomnia and fatigue, met its legal obligation. However, based upon the contents of the Peer Review Report, it appears Defendant made no attempt to consider the possibly disabling impact the combination of Leslie's multiple complaints and symptoms had upon her.

**CONCLUSION**

Based upon the foregoing, the Court should find Defendant abused its discretion and enter summary judgment in favor of the Plaintiff.

Respectfully submitted,

**MCCHESNEY & DALE, P.C.**

By:        /s/
Charles F. Fuller (Bar (#05557)
4710 Bethesda Avenue, Ste. 205
Bethesda, MD 20814
Telephone: (301) 657-1500
Fax: (301) 657-1506
chuck@dalelaw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2017, a copy of the foregoing was served by electronic filing via CM/ECF to the registered participants as identified on the Notice of Electronic Filing:

S. Libby Henninger, Esquire
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, N.W., Suite 400
Washington, DC  20006
*Counsel for Defendant*

Daniel W. Srsic
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215
*Counsel for Defendant*

_____/s/_____
Charles F. Fuller

21