**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

LESLIE R. VETTER,            *

      Plaintiff,         *

v.                 *      Case No.: PWG-16-2833

AMERICAN AIRLINES, INC. PILOT   *
   LONG-TERM DISABILITY PLAN,
                   *

      Defendant.       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Leslie R. Vetter is a pilot for American Airlines, Inc. ("the Airline"). The Airline sponsored an employee benefit plan, Defendant American Airlines, Inc. Pilot Long-Term Disability Plan (the "Plan), administered by the Pension Benefits Administrative Committee (the "Plan Administrator"). Vetter stopped working in January, 2012 due to health problems including fatigue, depression, and severe stomach pains. Administrative Record ("AR") 164–65, ECF No. 21. She took sick leave through February 21, 2012, then applied for long-term disability benefits pursuant to the Plan in April 2012. AR 60, 118. The Plan Administrator initially denied the benefits on July 31, 2012. AR 158–62. On appeal, it awarded her benefits of $12,795.79 for the period from May 3, 2012 through July 23, 2012, but determined that benefits were not appropriate after July 23, 2012 because Vetter no longer was disabled. AR 57–69. It did not address benefits between February 22, 2012, when Vetter stopped receiving pay, and May 3, 2012.

In this action, filed pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, Vetter challenges the denial of benefits for the periods from February 22, 2012 until May 3, 2012, and July 23, 2012 until she returned to work on October 1, 2013. *See* Compl., ECF No. 1; Pl.'s Reply & Opp'n 1 n.1, ECF No. 29. The parties have filed and fully briefed cross-motions for summary judgment. ECF Nos. 23, 23-1, 26, 29, 30. A hearing is not necessary. *See* Loc. R. 105.6. I find that the Plan's decision not to award benefits before May 3, 2012 or after July 23, 2012 was not supported by substantial evidence, but also that the onset and duration of Vetter's disability are not clear on the record before me. Therefore, I will deny the parties' cross-motions for summary judgment, and remand the case to the Plan Administrator for further proceedings.

## Background[1]

Pursuant to agreements that the Airline entered into with the Allied Pilots Association ("APA," the union that represents Vetter and other pilots), the Airline provides, administers and funds the Plan, which provides long-term disability benefits for eligible pilots. Plan § I, AR 133. The Plan defines "disability" or "disabled" as "an illness or injury, verified through a qualified medical authority in accordance with Section V of the Plan, which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer," with exceptions not relevant here. Plan § III.N, AR 135. An "Active Pilot Employee" is "a Pilot Employee who performs or is eligible to perform duties as a pilot for the [Airline]." *Id.* § III.A, AR 133. It is not disputed that Vetter is a Pilot Employee.

American Airlines described the Pilot Employee position as follows:

---

[1] For each cross-motion, the relevant facts are "viewed in the light most favorable to the non-movant." *Lynn v. Monarch Recovery Mgmt., Inc.*, No. WDQ-11-2824, 2013 WL 1247815, at *1 n.5 (D. Md. Mar. 25, 2013) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003)).

Reports for duty before assigned flight. Access computer terminals for sign-in and acquisition of flight plans, weather information and other associated documents. Analyzes in concert with Flight dispatch, the plan of intended routing and fuel loading taking into account weather and other conditions.

Conducts detailed examination of exterior and interior of aircraft. . . . and determine whether aircraft is acceptable for safe flight operation.

Completes pre-flight checklists (manually & visually), contacts FAA by radio to acquire clearances and brief flight attendants.

Supervises push-back activities and taxi aircraft to runway. . . .

During flight, performs checklist, visually monitors aircraft systems, communicates with FAA facilities, navigates and monitors air traffic. Simultaneously, monitor enroute [sic] weather, and alter routing as necessary while continually analyzing fuel consumption. In the event of abnormal or emergency situations, take immediate required action and determine if immediate landing is necessary.

Plans and executes approach and landings, often at night and in inclement weather. . . .

Taxis aircraft to gate, shut down engines and prepare for the next flight segment.

*Must be able to work varying hours of the day or night, on weekdays, and holidays. Frequently on duty for as long as twelve to fourteen hours* and will span many time zones and extreme weather differences in the course of a trip. Frequently be away from home for three, or more days and nights, staying in out-of-town hotels.

Am. Airlines Job Description & Essential Functions, AR 621 (emphasis added). Vetter was required to have, *inter alia*, an FAA Commercial License and a Valid First Class Medical Certificate. *Id.* at 622.

Vetter "started experiencing declining health" in June 2011; by January 2012, her symptoms included insomnia, fatigue, nausea, vomiting, headaches, trouble concentrating, stomach pain, and depression. Vetter Decl., AR 164. She no longer felt able to perform the job responsibilities involved in piloting a commercial aircraft as of January 2012, and she began taking sick leave on January 5, 2012. *Id.* at 164–65; Aug. 12, 2013 Ltr., AR 60. She exhausted her sick leave by February 21 2012, and then was approved for unpaid sick leave of absence.

Vetter Decl., AR 165; Aug. 12, 2013 Ltr., AR 60. Vetter originally sought long-term disability benefits on April 12, 2012, Notice of Disability, AR 118; by letter dated July 31, 2012, the Plan denied her claim due to "insufficient evidence that [she had] a Disability as required by the Plan." Ltr., AR 159.

Vetter appealed. According to Vetter, her condition worsened in summer 2012 and she "started suffering symptoms similar to Bells Palsy." Vetter Decl., AR 165. In her January 28, 2013 Declaration, Vetter stated that she recently was diagnosed with Lyme disease and that two physicians, Dr. Kessler and Dr. Corrigan, found that she was "ineligible to fly due to a medical condition and w[ould] not be eligible until [her] illness resolve[d]." *Id.* at 164, 165. On appeal, the Plan approved Vetter for long-term disability benefits "because of [her] medical inability to act as a Pilot" due to "her claimed condition of insomnia," but only for the period May 3, 2012 through July 23, 2012. Sept. 25, 2013 Ltr., AR 52; Aug. 12, 2013 Ltr., AR 57.

Thus, it is undisputed that Vetter had a qualifying disability from May 3, 2012 until July 23, 2012. Therefore, the issue is whether the Plan abused its discretion in finding that Vetter's disability did not exist prior to May 3, 2012 and ceased to exist after July 23, 2012. A disability "exist[s]" and "continue[s] to exist[] only if the Pilot Employee has received and continues to receive qualified medical care consistent with the nature of the illness or injury that gives rise to such Disability." Plan § V.A, AR 138. A disability "cease[s] to exist" for purposes of the Plan "if (1) health is restored so as not to prevent the Pilot Employee from acting as an Active Pilot Employee in the service of the [Airline], (2) verification of such Disability can no longer be established or (3) appropriate medical care is wantonly disregarded by such Pilot Employee." Plan § V.B, AR 138.

The Plan provides that "[a]ny dispute as to the clinical validity of a Pilot Employee's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical authority selected under the Agreements" between the Airline and the APA, "and the findings of such authority regarding the nature and extent of such illness or injury shall be final and binding upon the [Airline], the [APA] and the Pilot Employee . . . ." Plan § V.D, AR 138. The Plan's review of any denial of a claim for disability benefits must "take into account all comments, documents, records, and other information submitted by the Pilot Employee relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Id.* § VIII.F(6), AR 147-48. And, "[i]f the adverse determination was based, in whole or in part, on a medical judgment, the Pension Benefits Administration Committee shall consult with a health care professional who has appropriate training and experience in the field involved in the medical judgment." Plan § VIII.F(7), AR 148.

Consistent with this provision, when Vetter appealed, the Plan submitted Vetter's case file to MES Solutions, Inc. ("MES"), "an independent clinical consulting firm mutually agreed upon by [the Airline] and the APA, for its review and medical opinions on the case." Aug. 12, 2013 Ltr., AR 67. The Plan "request[ed] that MES Solutions perform an evidence-based, forensic medical review/evaluation ('peer review') . . . conducted by [a] Senior AME [Aviation Medical Examiner] and any additional board-certified physician specialists." June 3, 2013 Ltr., AR 90. The medical examiner selected was Dr. James W. Butler, M.D., M.P.H. Aug. 12, 2013 Ltr., AR 67, 69, 72. Four specialists also reviewed the file. *Id.* The Plan asked MES to review "the submitted information" and stated that, if that did "not enable the Senior AME and the

board-certified physician specialists to provide a clear and definitive determination on the case," MES could "request that the Pilot submit to an Independent Medical Evaluation." *Id.*

In its June 3, 2013 letter to MES, the Plan stated that Vetter claimed the following conditions: hypothyroidism, perimenopause, chronic insomnia with resulting fatigue, irritable bowel syndrome with constipation, persistent epigastric and abdominal pain, and positive Epstein Barr virus and Cytomegalovirus antibodies. June 3, 2013 Ltr., AR 90. The Plan posed specific questions with regard to each claimed condition and noted that "this request for professional medical consultation is to determine disability and treatment compliance only, as referenced in the Plan" and it "should not address the Pilot's fitness for duty, qualification or disqualification for FAA medical certificate for the Pilot, Pilot loss of license, or factors other than those contained in the questions [posed]." *Id.* at 91. The Plan explained that its "determining factors for approval of disability benefits focus on whether or not the Pilot meets the Plan's definition of disability, and/or whether or not the Pilot meets the requirement of receiving and complying with qualified medical care." *Id.* In response, "MES Solutions, Inc. physician consultants provided their professional medical opinions regarding the Pilot's medical conditions and their relationship, if any, to Disability as defined by the Plan." Aug. 12, 2013 Ltr., AR 67.

The Plan informed Vetter that the MES physician consultants considered the "diagnoses/affected organ systems" listed in the June 3, 2013 letter, as well as Lyme Disease, Atypical Bartonella infection, and Atypical Babesiosis. *Id.* It is true that, although Lyme Disease and the other infections were not included in the instructions to MES, three of the four physicians (whose reviews Dr. Butler agreed with) noted these diagnoses. *E.g.*, Jad A. Khoury, M.D. Review, AR 73 ("She was given a diagnosis of possible babesiosis, possible Lyme disease

and atypical bartonellosis and received multiple antibiotics and antimalarials."); Ronald S. Sims, M.D. Review, AR 79 (considering "claimant's work capacity as regards insomnia and fatigue"; noting diagnoses of "Lyme disease, babesiosis, bartonellosis"); Steven C. Talwil, M.D. Review, AR 84 ("9/6/12 was told by infectious disease to take doxycycline for treatment of Lyme disease. 3/18/13 she reported having 85% of her normal energy level with some G.I. symptoms.").

According to the Plan, the physicians opined that Vetter had "[n]o disability attributable to" hypothyroidism, perimenopause, Epstein-Barr virus exposure or Cytomegalovirus exposure, and "[n]o evidence of disability as a result of" Atypical Bartonella infection or Atypical Babesiosis." Aug. 12, 2013 Ltr., AR 67–68. Similarly, they concluded that her irritable bowel syndrome with constipation and her persistent epigastric and abdominal pain "did not disable her from performing her duties as a pilot." *Id.* As for Lyme disease, they found that there was "[n]o evidence of involvement in the central nervous system." *Id.* In contrast, with regard to Vetter's chronic insomnia with fatigue, the Plan reported that the MES physician consultants opined: "Her impaired sleep deficiency did disable her from performing her duties as a pilot. However, the records reflect that her insomnia was mostly resolved by July 23, 2012." *Id.*

Dr. Sims, who is board-certified in neurology with a subspecialty certificate in sleep medicine, in consultation with Dr. Butler's office, reviewed Vetter's file with regard to chronic insomnia and fatigue. Specifically, he reviewed Vetter's Declaration, a statement from Dr. James Shaller, various laboratory reports and a polysomnogram, notes from Dr. William Cooper, Jr., M.D., Dr. Mark Richards, M.D., Dr. Manoel Moraes, M.D., Dr. Marina Johnson, M.D., Dr. Brian Turrisi, M.D., Dr. William Stern, M.D., Dr. Lynette Posorske, M.D., and Dr. David Kessler, M.D., and on July 19, 2013, answered questions posed by the Plan. Sims Review, AR 79.

Dr. Johnson stated that Vetter was "under [her] care for hypothyroidism, perimenopause, chronic insomnia and IBS-C," and, that "[a]t her initial visit"—for which Dr. Johnson does not provide a date, although the records reflect that she requested lab work for Vetter on February 28, 2012—"she had severe insomnia . . . that was causing her great fatigue."  Johnson Ltr., AR 37–38.  As of Vetter's June 6, 2012 visit, "her sleep [was] normalized, and she average[d] 8 hours nightly."  *Id.* at 37.  At that time, Vetter's "thyroid medicine and dosage [was] stabilized and d[id] not constitute a reason to prevent her from flying."  *Id.*  Dr. Johnson opined that "[a]t th[at] point, the problem that [was] inhibiting her return to work [wa]s her epigastric and abdominal pain."  *Id.*  Dr. Turrisi saw Vetter almost seven weeks later, on July 23, 2012, and made similar observations.  Turrisi Ltr., AR 533.  Specifically, he noted that "[s]he [wa]s sleeping a lot better . . . after being on ton of herbal supplements that have [been] prescribed by various physicians and she [wa]s . . . getting back to her normal sleep pattern."  *Id.*  He observed that "[h]er ability to exercise [was] curtailed by her fatigue and she d[id] have mild continued problems with sleep," but "[n]o insomnia, snoring or excessive daytime sleepiness."  *Id.* at 533–34.

Dr. Stern also noted a continuation of Vetter's difficulties sleeping in June and July 2012, although he did not state the severity.  Stern Ltr., AR 523–25.  On June 21, 2012, Dr. Stern noted that a year earlier, Vetter had "had episodes of night sweats, nausea, vomiting, and fatigue," and that, since then "[s]ome of her symptoms of mild depression improved, but her other symptoms persisted."  *Id.* at 523.  His "impression" included fatigue and sleep disorder.  *Id*. at 524–25.  When Dr. Stern saw her on July 12, 2012, her "main complaints [we]re fatigue and sleeping problems."  *Id.* at 556.  Then, after seeing Vetter on August 16, 2012, he stated that she "ha[d] noted some slight improvement in her symptoms."  *Id.* at 554.

Dr. Shaller saw Vetter four days later, on August 20, 2012 and observed "[s]evere and profound fatigue[,] [d]aily headaches[,] [s]leep disturbances[,] [w]eight dysregulation [and] [m]igrating joint pain," and diagnosed babesiosis, atypical bartonella infection, and systematic inflammation. Shaller Ltr., AR 245. He concluded that these conditions were "undermining her ability to safely perform her duties as a pilot at this time." *Id.* at 246. He predicted 100% recovery, but "doubt[ed] that she [could] safely perform her duties as a pilot of a large commercial aircraft before four months." *Id.* at 248. On August 22, 2012, Dr. Kessler made a brief note that he had "seen Ms. Vetter th[a]t day and ha[d] deferred examination for a First Class Medical [Certificate]," reasoning that she was "currently symptomatic and [wa]s unable to function as a flight officer until therapy [was] completed and she ha[d] recovered." Kessler Note, AR 611.[2] Later that week, on August 27, 2012, Dr. Posorske noted that Vetter's symptoms, including "extreme difficulty in sleeping" and fatigue, "persist[ed]." Posorske Ltr., AR 602. Then, on March 18, 2013, Vetter informed Dr. Posorske that "she ha[d] approximately 85% of her normal energy level." Posorske Ltr., AR 643.

Dr. Sims discussed these findings. He noted that Dr. Turrisi "documented insomnia initially [in March 2012], but by 7-23-12 the office note indicated the absence of significant insomnia." Sims Review, AR 80. He also noted that Dr. Stern saw Vetter from June through August 2012 and "documented frequent nocturnal awakenings, night sweats, nausea/vomiting, fatigue, stomach pain and bloating." *Id.* at 79. Dr. Sims observed that Dr. Schaller opined in

---

[2] The Administrative Record also includes a September 6, 2012 letter from Dr. Paula Corrigan, M.D., M.P.H. & T.M. of the Aviation Medicine Advisory Service, AR 614, which Dr. Sims does not mention in his report. Dr. Corrigan stated that the Aviation Medicine Advisory Service had reviewed Vetter's medical records and, based on those records, "confirm[ed] that Ms. Vetter [was] currently prohibited from exercising the privileges of her Airman's Medical Certificate" and had "appropriately grounded herself while undergoing further evaluation and treatment for her condition." *Id.*

August 2012 that Vetter "was unable to work for at least the next four months," and as of September 25, 2012, he "expected her to be able to return to work as a flight officer by April 2013." *Id.* He also noted that the laboratory reports "detected evidence of exposure to the [Lyme disease] organism." *Id.* According to Dr. Sims, Dr. Posorske, in notes from August 2012 through April 2013 "documented symptoms as described [by the other physicians]," and found that "by August 2012 the symptom of severe insomnia with fatigue persisted," *id.*, and on August 22, 2012, Dr. Kessler "documented his opinion that claimant was not capable of functioning as a flight officer," *id.* at 81.

Based on these documents, Dr. Sims concluded (and Dr. Butler agreed) that Vetter "had persistent, severe insomnia for many months, but eventually had improvement of this problem (Dr. Turrisi, 7-23-12), although other medical evidence indicates persistence of insomnia and fatigue (Dr. Posorske, August 2012)." *Id.* at 81. He opined that "persistent fatigue, wake time somnolence, and insomnia" were "conditions [that] disabled her from performing her work satisfactorily," as "[h]er medical record abundantly documents that she was not able to function as a flight officer because she . . . had somnolence, impaired concentration, and fatigue associated with poor nocturnal sleep." *Id.* He noted that Vetter had "very extensive, ongoing medical care for a variety of problems," and that it was "not clear . . . exactly what caused the insomnia." *Id.* According to Sims, "[t]he medical records indicate some improvement in insomnia occurred by the summer of 2012," but "[t]he [January 28, 2013] statements in file by the claimant do not indicate that the insomnia resolved by this time." *Id.* at 82.

Based on MES's report and its review of Vetter's file, the Plan approved Vetter for long-term disability benefits "because of [her] medical inability to act as a Pilot," but only for the

period May 3, 2012 through July 23, 2012.  Sept. 25, 2013 Ltr., AR 52.  The Plan paid her a

lump sum of $12,795.79 to cover that period.  *Id.*  It explained that

> [a]fter evaluating all the information [Vetter] submitted in support of this appeal,
> along with any and all other information provided by [the Airline], American
> Airlines Medical and Occupational Health Services ('AAMOHS') and the
> physician-specialists at MES Solutions, Inc., acting in the capacity of an
> independent medical consulting firm jointly selected by both [the Airline] and
> [APA], the PBAC determined that [Vetter's] claimed condition of insomnia did
> qualify as a Disability under the terms of the Plan.  However, her other claimed
> conditions did not qualify as disabilities under the Plan.

Aug. 12, 2013 Ltr., AR 57.  According to the Plan,

> [o]f [Vetter's] multiple claimed conditions, the only condition that adversely
> affected her ability to perform her duties as a pilot was her insomnia and resulting
> daytime fatigue.  With conservative treatment, her insomnia markedly improved
> by July 23, 2012.  *While she still experienced periodic episodes of insomnia after
> that time, the condition was self-limiting and responded to conservative treatment.*
> Thus, her disability resulting from insomnia was no longer disabling after July 23,
> 2012.

*Id.* at 69 (emphasis added).

## Standards of Review

Summary judgment is proper when the moving party demonstrates, through "particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials," that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of

Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment

demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10

(1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* When the parties file cross-motions for summary judgment, as Vetter and the Plan have done, the Court must "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985).

When an employee benefits plan governed by ERISA grants the plan administrator "discretion to determine a claimant's eligibility for benefits," federal courts review the administrator's denial of disability benefits for abuse of discretion. *Smith v. PNC Fin. Servs. Grp.*, No. MJG-15-2232, 2017 WL 3116689, at *7 (D. Md. July 21, 2017) (quoting *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 165 (4th Cir. 2013) (citations omitted)), *appeal dismissed sub nom. Smith v. Liberty Life Assurance Co. of Boston*, No. 17-1975, 2018 WL 949221 (4th Cir. Jan. 29, 2018). But, first, the court must "determine de novo whether the 'plan's language grants the administrator . . . discretion to determine . . . eligibility for benefits.'" *Id.* (quoting *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002)). Then, under the abuse of discretion standard, the "court will set aside the plan administrator's decision only if it is not reasonable," and not simply because the court would have reached a different conclusion. *Id.* at *8 (quoting *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011); citing *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010)).

"A 'decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.' Substantial evidence is 'evidence which a reasoning mind would accept as sufficient to support a particular conclusion.'" *Id.* (quoting

*DuPerry*, 632 F.3d at 869). In the context of an ERISA action, substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Gonzales v. Truck Drivers & Helpers Local 355 Ret. Pension Fund*, 39 F. Supp. 3d 680, 686 (D. Md. 2014) (quoting *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966)); *see Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 715 (D. Md. 2012) (same) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620 (1966)). Substantial evidence is not "a large or considerable amount of evidence[.]" *Giles*, 925 F. Supp. 2d at 715 (quoting *Pierce v. Underwood,* 487 U.S. 552, 564–65 (1988)).

The court cannot "re-weigh the evidence itself" or "substitute [its] own judgment in place of the judgment of the plan administrator." *Smith*, 2017 WL 3116689, at *8 (quoting *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 325 (4th Cir. 2008); *Williams*, 609 F.3d at 630).

> [To] determin[e] the reasonableness of a fiduciary's discretionary decision, . . . a court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000).

## Discussion

The Plan provides that the Pension Benefits Administration Committee (which is the Plan Administrator) has "discretionary authority to determine eligibility for and entitlement to Plan

benefits" and the power "[t]o exercise discretionary authority to determine eligibility for benefits." Plan § VII.D(4), G, AR 142. This language clearly "grants the administrator . . . discretion to determine . . . eligibility for benefits." *See Gallagher*, 305 F.3d at 268; *Smith*, 2017 WL 3116689, at *7. And, the parties do not dispute that the Plan Administrator had discretion to make benefits eligibility determinations. Therefore, I will consider the reasonableness of its decision. *See DuPerry*, 632 F.3d at 869; *Smith*, 2017 WL 3116689, at *8.

The third and fifth factors—the adequacy of the materials that the Plan considered in denying Vetter benefits after July 23, 2012 and, more significantly, the degree to which the materials support its decision, as well as whether the Plan's "decisionmaking process was reasoned and principled—are most relevant and useful in determining the reasonableness of the Plan's decision. *See Booth*, 201 F.3d at 342. I will focus on these two factors. *See id*. at 344 ("In the district court, Booth challenged the decision of the Plan's Administrative Committee to deny in part her claim for benefits, implicating two factors in [the court's] 'reasonableness' inquiry under the abuse of discretion standard of review: (1) the degree to which the materials before the committee supported its decision, and (2) the process by which the decision was made."); *Whitley v. Hartford Life & Acc. Ins. Co.*, 262 F. App'x 546, 551 (4th Cir. 2008) ("In this case, we focus primarily on the sufficiency of the evidence upon which Hartford based its conclusion that Whitley failed to continue to qualify for disability benefits, as well as the reasonableness of Hartford's decision-making process.").

*Decisionmaking Process*

1. *Reviewing conditions in isolation*

Vetter asserts that the Plan "limited MES' medical records review and its resulting opinions" by "instruct[ing] MES to evaluate certain medical conditions and then answer specific

questions Defendant posed regarding whether disability arose from such independent medical condition." Pl.'s Mem. 17. In her view, this is an abuse of discretion because "a plan administrator may not simply evaluate each condition independently to determine whether any single condition is sufficiently disabling," but rather must "evaluate the possibly disabling effect of all medical conditions taken together." *Id.* at 18. Insofar as she argues that the Plan's instructions prevented consideration of Lyme disease, *id.* at 22–23, this is not true. As discussed above, although Lyme disease was not listed on the Plan's letter to MES, three of the four physicians noted the diagnosis when analyzing Vetter's conditions. *See* Khoury Review, AR 73; Sims Review, AR 79; Talwil Review, AR 84. Moreover, Dr. Sims considered Lyme disease specifically with regard to the effects of the insomnia and fatigue Vetter experienced. *See* Sims Review, AR 79.

To the extent that Vetter argues that the Plan compartmentalized her conditions, preventing consideration of her conditions "taken together" or proper review of the "record as a whole," Pl.'s Mem. 18–19, the Fourth Circuit has considered and rejected this argument. *See Spry v. Eaton Corp. Long Term Disability Plan*, 326 F. App'x 674 (4th Cir. 2009). In *Spry*, an employee was eligible for long-term disability benefits if she showed that she could not "work due to an illness or injury"; that she was "totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which [she was] reasonably well fitted by reason of education, training or experience," such that her illness or injury qualified as a "covered disability"; and that she was "under the continuous care of a physician who verifie[d]" that she was "totally disabled." *Id*. at 675. The plan administrator terminated her long-term disability benefits, and she challenged the decision, "contend[ing] that each of the medical opinions the Administrator relied on in deciding to terminate her LTD benefits [was] flawed

because they did not assess all of Spry's conditions." *Id.* at 681. The Fourth Circuit affirmed the administrator's decision, reasoning that "[t]he critical point [wa]s that the *Administrator* considered all of the conditions," and "the Administrator was not limited to considering the opinions of physicians who addressed all of Spry's conditions. . . . And, nothing in the record suggest[ed] that the Administrator relied on any physician's opinion for a proposition broader than the opinion that the physician rendered." *Id.* Spry also faulted the plan administrator for "not considering whether Spry's various medical conditions were cumulatively disabling." *Id.* The Fourth Circuit did not find any reversible error, given that diabetes was the only condition "ever listed by Spry's primary care physicians as being disabling," and the medical opinion regarding diabetes was that "there was no evidence that Spry's diabetes would prevent her from performing the duties of any occupation." *Id.*

Here, likewise, the Plan sought input from the independent medical reviewers on specific conditions, but the Plan itself considered *all* of the reviewers' reports. Aug. 12, 2013 Ltr., AR 57. Moreover, the Plan also "evaluat[ed] *all the information* [Vetter] submitted in support of this appeal, along with *any and all other information* provided by [the Airline and] American Airlines Medical and Occupational Health Services . . . ." *Id.* Thus, the Plan did not abuse its discretion in requesting specific reports from the medical reviewers. *See Spry*, 326 F. App'x at 681.

Further, the individual physicians did not consider Vetter's conditions in a vacuum, but rather acknowledged her various symptoms and diagnoses in their assessments, and Dr. Butler reviewed and agreed with all four reports. For example, while assessing the effects of claimant's alleged hypothyroidism and exposure to Epstein Barr virus and Cytomegalovirus, Dr. Khoury noted her symptoms of "poor sleep, daytime fatigue and inability to concentrate, depressive

symptoms, weight gain and abdominal pain," and her diagnoses of "small intestine bacterial overgrowth syndrome[,] . . . irritable bowel syndrome with constipation predominance[,] . . . possible babesiosis, possible Lyme disease and atypical bartonellosis[ and] perimenopause." Khoury Review, AR 72–73. He also considered the effects that Vetter's conditions had on her. *Id.* at 73 (noting that "the claimant has made real improvements when treated for presumed Babesia and Bartonellosis"; that "the sleep normalized as of 6/6/12 but the claimant continued to have abdominal pain"; that "the claimant had ~85% of her normal energy level back but was still having GI symptoms"). Similarly, while considering Vetter's insomnia and fatigue, Dr. Sims noted that she reported "multiple other symptoms including (to use her terms) exhaustion, depression, headache, impairment of concentration, nausea/vomiting, abdominal pain, joint pain, weight loss, and inability to function in waking hours" and that her diagnoses included "symptoms associated with perimenopause, low testosterone, a thyroid disorder, gastrointestinal bacterial overgrowth, Lyme disease, babesiosis, bartonellosis"). Sims Review, AR 79. Likewise, Dr. Talwil noted Vetter's "history of hypothyroidism, perimenopause, insomnia, fatigue, irritable bowel syndrome with constipation, persistent epigastric and abdominal pain, positive EBV and CMV antibodies," and noted that her medical care included "tak[ing] doxycycline for treatment of Lyme disease." Talwil Review, AR 83.

And, as in *Spry*, the independent physicians only concluded that one condition—chronic insomnia and fatigue—was disabling, that is, that it interfered with her ability to perform as a pilot. *See* Sims Review 81 ("[P]ersistent fatigue, wake time somnolence, and insomnia . . . disabled her from performing her work satisfactorily."). The medical reviewers found that the other conditions were not disabling, and in multiple instances, they found that the conditions were not even present. *See* Khoury Review, AR 74–75 (concluding that "patient d[id] not

actually have a supported diagnosis of hypothyroidism" and "there [wa]s no evidence of active infection" from Epstein Barr virus or Cytomegalovirus); Ronald J. Orleans, M.D. Review, AR 76 (concluding that "there was no evidence in the gynecological records that the claimant was 'Perimenopausal' or had a 'Perimenopausal syndrome' which would have prevented her from working" and "there was no evidence to support any restrictions or limitations which would have prevented the claimant from piloting an aircraft"); Talwil Review, AR 83 ("The plan definition for disability was not met with respect to irritable bowel syndrome with constipation or epigastric pain/abdominal pain."). Therefore, there was no abuse of discretion in considering whether any specific claimed condition, rather than the combined effects of multiple conditions, qualified as a disability, because there were no cumulative effects to consider. *See Spry*, 326 F. App'x at 681.

### 2. *Fitness for duty*

Vetter also argues that the Plan's instruction that MES "**not** consider fitness for duty" was "inconsistent with the Plan provisions" and prevented a determination of whether she was disabled, that is, unable to perform her job requirements. Pl.'s Reply & Opp'n 11–12. It is true that the physician consultants were directed not to consider "fitness for duty." June 3, 2013 Ltr., AR 91. But, the Plan explained that its "determining factors for approval of disability benefits focus on whether or not the Pilot meets the Plan's definition of disability," *id*., and disability is defined as whether the employee had an illness or injury that "prevent[ed] [her] from continuing to act as an Active Pilot Employee." Plan § III.N, AR 135. Consequently, to determine whether Vetter was disabled under the Plan, the independent physicians necessarily had to address whether, in light of her alleged conditions, she could perform her job responsibilities. *See id*. And, that is exactly what they did. *E.g.*, Sims Review, AR 81 ("[Q.] Does the evidence reflect

disability (as defined by the Plan), arising from this diagnosis [insomnia]? . . . [A.] Numerous medical notes documented the symptoms of persistent fatigue, wake time somnolence, and insomnia. These conditions disabled her from performing work satisfactorily. The claimant's occupation as a flight officer absolutely requires intact concentration and freedom from somnolence during waking hours. Her medical record abundantly documents that she was not able to function as a flight officer because she . . . had somnolence, impaired concentration, and fatigue associated with poor nocturnal sleep."); Talwil Review, AR 83 (stating that he and Dr. Butler "discussed that the illness or injury as reflected by the progress notes and clinical information submitted to review would not prevent a pilot employee from continuing to act as an active pilot employee," such that "[t]he plan definition for disability or disabled was not met with respect to irritable bowel syndrome with constipation or epigastric pain/abdominal pain"). Accordingly, the Plan's "decisionmaking process was reasoned and principled." *See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000).

### *Materials that the Plan Considered*

Vetter contends that the Plan ignored evidence that "persistent insomnia and fatigue existed [for at least eight months] after Dr. Turrisi's July 23, 2012 note," relying instead "upon the single report of a pulmonologist [Turrisi] who only saw the Plaintiff on a few occasions between March and July 2012." Pl.'s Mem. 20.[3] According to Vetter, when, as here, there is conflicting evidence, the Plan Administrator cannot ignore relevant evidence that does not support its decision and cherry pick evidence to support its decision. *Id.* at 19. Vetter insists that the Plan's "conclusion that Plaintiff's fatigue and insomnia had resolved by July 23, 2012, and

---

[3] Insofar as Vetter also argues that the Plan ignored evidence of Lyme disease and "did not include Lyme disease as a medical condition that MES should review," Pl.'s Mem. 20, as I already discussed, a number of the physicians whose reports appear in the Administrative Record, including the MES consultants, noted evidence of Lyme disease.

she was not entitled to benefits after that date, disregarded substantial contra[r]y evidence supporting Plaintiff's disability" and was contrary to the Plan's medical reviewer's report. *Id*. at 21.

The Plan counters that, while "a plan administrator 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician,' . . . [a]n administrator able to credit reliable evidence is not 'arbitrarily refus[ing] to credit the claimant's evidence.'" Def.'s Opp'n & Mem. 19 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). In the Plan's view, the evidence Vetter relies on to show that her fatigue continued beyond July 23, 2012, is less supportive that she asserts, as it does not "clearly identify her current status." *Id*. (citing AR 602). The Plan argues that the Plan Administrator "considered all of Plaintiff's evidence, but relied primarily upon the opinions it obtained from Dr. Butler and the other experts with whom he consulted." *Id.* at 15 (citing AR 57–69). It insists that "[a]n administrator does not abuse its discretion by relying on the medical opinions of independent physicians who review medical records and the other submitted materials." *Id.*

It is true that, when there are conflicting medical opinions, the Plan has the discretion to deny benefits based on one set of opinions, despite the other opinions to the contrary. *See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000) ("Confronted with this record of conflicting opinion, it was within the discretion of the Administrative Committee—indeed it was the duty of that body—to resolve the conflicts, and . . . 'it is not an abuse of discretion for a plan fiduciary to deny ... benefits where conflicting medical reports were presented.'" (quoting *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir. 1999)). In *Booth*, not all of the evidence before the committee supported its determination. Rather, "[l]etters from Booth, [her general physician and another physician] presented evidence

to the Administrative Committee that conflicted with the opinions of the reviewing Drs. Allen and Arkins," with her general physician's letter going so far as to explain his records to refute the conclusions the independent physicians reached in reviewing those records. *Id.* at 345. The Fourth Circuit concluded that, "[b]ecause sufficient evidence [wa]s contained in the record to support the determination that Booth was treated during the exclusionary period for either the same condition later treated in November 1994 or a symptom or secondary condition thereof," such that the pre-existing condition exclusion applied, "the district court clearly erred in concluding that the Plan's Administrative Committee abused its discretion in denying Booth benefits." And, in *Elliott v. Sara Lee Corp.*, the Fourth Circuit observed that, even if the treating physician's "report suggested that Elliott could perform no work at all, that fact would not preclude the Plan Administrator from denying benefits," because there was evidence to the contrary and "it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented." 190 F. 3d 601, 606 (4th Cir. 1999).

Here, two physician's reports dated June 6, 2012 and July 23, 2012 support the Plan's conclusion that as of July 23, 2012, Vetter's sleep difficulties were not preventing her from performing her duties as a pilot. Dr. Johnson found that, as of June 6, 2012, Vetter's "sleep [was] normalized, and she average[d] 8 hours nightly." Johnson Ltr., AR 37. And, Dr. Turrisi found that, on July 23, 2012, Vetter was "getting back to her normal sleep pattern," and although she had "mild continued problems with sleep," she had "[n]o insomnia, snoring or excessive daytime sleepiness." Turrisi Ltr., AR 533–34.

True enough. But, what Vetter seeks are long-term disability benefits from February 22, 2012 until May 3, 2012, and *after* July 23, 2012, until October 1, 2013, when she returned to work. A careful review of the physicians' opinions that the parties cite, as well as those on

which MES relied, from *after* July 23, 2012 reveals that they uniformly noted that Vetter had fatigue and difficulty sleeping in August 2012. Some opined in August 2012 or later that Vetter could not perform her duties as a pilot; none affirmatively stated that she could. For example, Dr. Shaller noted Vetter's "[s]evere and profound fatigue[,] [d]aily headaches [and] [s]leep disturbances" on August 20, 2012; concluded that these conditions were "undermining her ability to safely perform her duties as a pilot"; and "doubt[ed] that she [could] safely perform her duties as a pilot of a large commercial aircraft before four months." Shaller Ltr., AR 245–46, 248. On August 22, 2012, Dr. Kessler noted that he had "seen Ms. Vetter th[a]t day and ha[d] deferred examination for a First Class Medical [Certificate]" because she was "symptomatic and [wa]s unable to function as a flight officer until therapy [was] completed and she ha[d] recovered." Kessler Note, AR 611. Dr. Posorske noted that Vetter's fatigue and "extreme difficulty in sleeping" persisted on August 27, 2012. Posorske Ltr., AR 602. On August 16, 2012, Dr. Stern "noted some slight improvement in her symptoms" of fatigue and difficulty sleeping, but did not address whether she improved enough to be able to work. Stern Ltr., AR 554, 556. Additionally, Dr. Corrigan reviewed Vetter's medical records on September 6, 2012, and found that Vetter's condition at that time "prohibited [her] from exercising the privileges of her Airman's Medical Certificate." AR 614.

And, while the independent physician consultants, Drs. Sims and Butler, noted that Vetter "had improvement of this problem" of "persistent, severe insomnia" based on Dr. Turrisi's July 23, 2012 letter, they also noted that "other medical evidence indicate[d] persistence of insomnia and fatigue [in] August 2012[]," based on Dr. Posorske's letter. Sims Review, AR 81. They opined that "persistent fatigue, wake time somnolence, and insomnia" were "conditions [that] disabled her from performing her work satisfactorily," as "[h]er medical record abundantly

documents that she was not able to function as a flight officer because she . . . had somnolence, impaired concentration, and fatigue associated with poor nocturnal sleep." *Id*. Notably, they did not state that after July 23, 2012, she no longer was "disabled . . . from performing her work satisfactorily." *See id*. Indeed, the Plan has not identified *any* evidence that, after July 23, 2012, Vetter did not have sleep difficulties that rendered her unable to perform her duties as a pilot.

Yet, despite this uncontradicted evidence that Vetter's disability persisted after July 23, 2012, the Plan concluded that "her insomnia markedly improved by July 23, 2012," and that, "[w]hile she still experienced periodic episodes of insomnia after that time, the condition was self-limiting and responded to conservative treatment." Aug. 12, 2013 Ltr., AR 69. It did not explain the basis for its beliefs that, after July 23, 2012, her insomnia was still "markedly improved," that her insomnia was confined to "periodic episodes" and that it was "self-limiting and respon[sive] to conservative treatment." Nor did it explain its finding that Vetter was not disabled until May 3, 2012, when Johnson noted "severe insomnia" and fatigue at Vetter's initial visit, which may have been as early as February 2012; Turrisi noted insomnia in March 2012; and Stern noted sleep difficulties in June 2011. AR 37–38, 80, 523. Nor does the Plan now identify evidence in the record in support of its conclusion. The Fourth Circuit has held that it is an abuse of discretion for a plan administrator to reach a conclusion regarding disability benefits that is contrary to all of the relevant evidence before it. *See Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 261 (4th Cir. 2017); *Jani v. Bell*, 209 F. App'x 305, 307, 314, 316 (4th Cir. 2006); *Stawls v. Califano,* 596 F.2d 1209 (4th Cir. 1979).

In *Solomon*, a retired football player applied for disability benefits and there was "uncontradicted evidence supporting Solomon's application," yet the plan administrator found that Solomon was ineligible. 860 F.3d 259, 261 (4th Cir. 2017). The Fourth Circuit affirmed the

district court's conclusion that "Solomon was entitled to the benefits he claimed," because the administrator "failed to . . . explain the basis of its determination [of ineligibility]—neither addressing nor even acknowledging new and uncontradicted evidence supporting Solomon's application, including that of the Plan's own expert." *Id.*

In *Jani v. Bell*, another case involving a professional football player who sought disability benefits, the plan administrator awarded the player, Mike Webster, benefits based on his disability arising in September 1995, four years after he retired, "but denied him the more lucrative benefits reserved for those whose disabilities begin while they are still actively playing football." 209 F. App'x 305, 306 (4th Cir. 2006). His estate filed an ERISA action, and the district court found that the plan administrator "abused its discretion by ignoring the unanimous medical evidence that established March 1991 as the onset date for Webster's total and permanent disability." *Id.* The district court observed that "[e]ach specialist who examined Webster's neurological status concluded that he was totally and permanently disabled under the terms of the Plan by March 1991." *Id.* at 313 (quoting *Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 04-1606, 2005 WL 1115250, at *6 (D. Md. Apr. 26, 2005)).

On appeal, the Fourth Circuit observed that all of the medical reports pertaining to Webster's mental state or brain damage unanimously found that he was disabled by 1991, and "evaluations of Webster by various doctors during the critical period that tended to show he was 'generally in good health[]'" did not "comment on Webster's health," and indeed, those doctors were not qualified to do so. *Id.* at 316. The court "recogniz[ed] that the decisions of a neutral plan administrator are entitled to great deference," but said that it was "nevertheless constrained to find on these facts that the [administrator] lacked substantial evidence to justify its denial here," given that the administrator "ignored the unanimous medical evidence, including that of

its own expert, disregarded the conclusion of its own appointed investigator, and relied for its determination on factors disallowed by the Plan." *Id.* at 307. The court noted that, in light of the substantial evidence requirement, "it logically follows that a fiduciary appears to abuse its discretion when, in denying benefits, it ignores unanimous relevant evidence supporting the award of benefits." *Id.* at 314.

The Fourth Circuit reasoned that it had "required benefits administrators to follow unanimous evidence in other contexts in which [it] employs an abuse of discretion standard as well," such as in "*Stawls v. Califano,* 596 F.2d 1209 (4th Cir. 1979), a case involving a social security disability benefits claim." *Jani*, 209 F. App'x at 314. In *Stawls*,

> the administrator denied the applicant's claim for T & P disability benefits because it found that she was unable to prove that her T & P disability began prior to 1962 and was continuously present thereafter. The administrator ignored the medical opinion of one psychiatrist that the applicant's schizophrenia was indeed continuously disabling, rather than intermittently so, and the medical opinion of another psychiatrist that the disability began prior to 1962. The second psychiatrist, though he had treated the applicant since 1954, had lost his contemporaneous notes. He nevertheless opined in 1976 that the applicant had been disabled prior to 1962. The applicant challenged the denial of benefits in court, and this court ultimately remanded the dispute to the benefits administrator, demanding an explanation for "why the uncontradicted evidence of the psychiatrists should not suffice to afford recovery." Thus, even though the second psychiatrist's ex post and undocumented opinion might have been less weighty were there conflicting medical opinions, it remained uncontradicted and could not therefore be ignored.

*Jani*, 209 F. App'x at 314 (citations omitted).

Here, the Plan abused its discretion in the same manner as the administrators had done in *Solomon*, *Jani*, and *Stawls*. As in *Solomon*, *Jani*, and *Stawls*, the evidence that Vetter was disabled under the Plan after July 23, 2012 was uncontradicted, yet the Plan concluded that she was no longer disabled. The physicians who opined that she did not have a disability only addressed her status in June or July 2012; they did not address the time period of July 23, 2012

until October 1, 2013, given that they provided their opinions before the period began. This is similar to *Jani*, where the evidence of general good health did not address the root of Webster's disability—his mental condition. And, as in *Solomon*, the Plan did not explain how it reached its determination that she was no longer disabled, or even acknowledge the evidence of ongoing disability, beyond a brief statement that Vetter "still experienced periodic episodes of insomnia after [July 23, 2012]." *See* Aug. 12, 2013 Ltr., AR 69; *Solomon*, 860 F.3d at 261. Nor did it explain its finding that Vetter was not disabled until May 3, 2012, when the evidence showed that she had insomnia and fatigue at least as early as March 2012. AR 37–38, 80, 523.

The evidence the Plan relied on—evidence that Vetter was sleeping normally as of July 23, 2012, when there was later evidence that her insomnia and fatigue persisted and prevented her from performing her job duties—simply is not "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *DuPerry*, 632 F.3d at 869; *Smith*, 2017 WL 3116689, at *8. There is not more than a scintilla of evidence that Vetter no longer was disabled after July 23, 2012; rather, all the record contains is evidence that Vetter was still disabled after July 23, 2012. And, the Plan has not identified any evidence at all supporting May 3, 2012 as the onset date. Accordingly, the Plan's decision was not supported by substantial evidence and therefore was not reasonable and must be set aside. *See DuPerry*, 632 F.3d at 869; *Laws,* 368 F.2d at 642; *Smith*, 2017 WL 3116689, at *8; *Gonzales*, 39 F. Supp. 3d at 686. Therefore, I will deny the Plan's motion for summary judgment upholding its decision. *See* Fed. R. Civ. P. 56(a), (c)(1)(A); *Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013); *DuPerry*, 632 F.3d at 869; *Smith*, 2017 WL 3116689, at *8.

But, I also cannot find as a matter of law that Vetter's disability began on a specific date or continued until her return to work in October 2013, or any other specific date, as the duration

and extent of her conditions are unclear on the record before me. Therefore, I also will deny

Vetter's motion for summary judgment. *See* Fed. R. Civ. P. 56(a), (c)(1)(A); *Baldwin*, 714 F.3d

at 833.

## Conclusion

The parties' cross-motions for summary judgment are denied. While "the Court may

award benefits to the claimant rather than remand the case" when it finds that "a plan

administrator abuses its discretion," remanding the case to the plan administrator for further

proceedings usually is the proper course of action. *Solomon v. Bert Bell/Pete Rozelle NFL Player*

*Ret. Plan*, No. MJG-14-3570, 2016 WL 852732, at *9 (D. Md. Mar. 4, 2016), *aff'd,* 860 F.3d

259 (4th Cir. 2017); *see Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F.

App'x 540, 548 (4th Cir. 2008) ("[I]t is generally the case that when a plan administrator's

decision is overturned, a remand for a new determination is appropriate."). This is because the

"administration of benefit and pension plans should be the function of the designated fiduciaries,

not the federal courts." *Gorski*, 314 F. App'x at 548 (4th Cir. 2008) (quoting *Bernstein v.*

*CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir. 1995)).

Given that the timeframe and amount of benefits is not clear on the record before me, I

will remand this case for further proceedings before the Plan Administrator.[4] *Cf. Gorski*, 314 F.

App'x at 549 ("Here, a remand to MetLife for a new determination is not necessary because the

---

[4] Vetter also argues that the Plan breached either its fiduciaries duty of loyalty or its fiduciary
duty of care by failing to provide her with a full and fair review of her benefits claim. Pl.'s
Mem. 22–24. This alleged breach is, at most, an element of Vetter's ERISA claim. *See* Paul
Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 522–27 (5th ed.
2013) (noting that, while no independent cause of action exists for breach of fiduciary duty,
breach of fiduciary duty can be alleged as an element of another cause of action, such as
negligence). Because I am remanding the case to the Plan Administrator, I need not reach this
argument.

record reflects that Gorski was clearly entitled to continued benefits. . . . [T]he only reasonable decision available to MetLife was to reverse its earlier decision discontinuing Gorski's benefits.").  Specifically, the Plan Administrator shall determine the date when Vetter's insomnia and fatigue rendered her disabled under the Plan, as well as the date on which that disability ceased to exist, and identify the evidence it relies on in support of its determinations.

## **ORDER**

Accordingly, it is this 5th day of March, 2018, by the United States District Court for the District of Maryland, hereby ORDERED that:

1.    Vetter's Motion for Summary Judgment, ECF No. 23, IS DENIED;

2.    The Plan's Motion for Summary Judgment, ECF No. 26, IS DENIED

3.    The case IS REMANDED to the Plan Administrator; and

4.    The Clerk SHALL CLOSE this case.


_____/S/_____
Paul W. Grimm
United States District Judge

lyb